FIRST DIVISION
December 7, 2009

No. 1-07-2606

| | | |
|---|---|---|
| U.S. BANK, a Corporation, as Independent | ) | Appeal from the |
| Administrator of the Estate of Willie Taylor, Deceased, | ) | Circuit Court of |
| | ) | Cook County. |
| Plaintiff-Appellee | ) | |
| | ) | |
| v. | ) | No. 03 L 9804 |
| | ) | |
| HAROLD LINDSEY and CARMICHAEL LEASING | ) | |
| COMPANY, INC., | ) | Honorable |
| | ) | James P. Flannery |
| Defendants-Appellants. | ) | Judge Presiding |

JUSTICE PATTI delivered the opinion of the court:

Plaintiff U.S. Bank, the independent administrator of the estate of Willie Taylor,

decedent, filed suit against defendants Harold Lindsey and Carmichael Leasing Company, Inc.

(Carmichael), alleging, among other things, that Lindsey acted negligently when he drove a truck

leased from Carmichael which struck decedent and resulted in his death.  Plaintiff alleged

negligence against Carmichael under the "logo liability" doctrine, claiming that it was vicariously

liable for the actions of Lindsey.  The matter was tried before a jury and a verdict was returned in

favor of plaintiff for $3 million and reduced by 50% based on decedent's contributory

negligence.  Defendants appeal the judgment of the circuit court alleging that: (1) the circuit

court erred in denying their motion for directed verdict based on immunity under the Illinois

Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq*. (West 2002)); (2) plaintiff failed as a

matter of law to establish that decedent was the biological father of the beneficiaries; (3) the

circuit court erred in allowing evidence of Lindsey's failure to obtain a commercial driver's license and lack of experience; (4) it was an abuse of discretion to allow testimony that the accident at issue was preventable; (5) it was error for the circuit court to bar evidence of decedent's alleged chronic heroin use; and (6) the effect of cumulative error merits a new trial. For the reasons that follow, we affirm the judgment of the circuit court.

BACKGROUND

Defendant Lindsey and decedent worked for Open Kitchens, a company that delivers food for children, people with disabilities and the Chicago Housing Authority's breakfast and lunch programs. On July 28, 2003, decedent was employed as a helper for Open Kitchens loading and unloading trucks that were delivering milk when Lindsey accidentally backed his truck into decedent, crushing him against another truck, ultimately resulting in his death. Lindsey was working as a truck driver for Open Kitchens on the day of the accident and the truck he was driving was leased to Open Kitchens from Carmichael, which owned the vehicle. Decedent was working in the dock area unloading another truck before Lindsey backed into him. Lindsey and decedent were not working together in the same truck that day, although they were both working for Open Kitchens at its location in Chicago, Illinois.

Jerry Williams was assigned to work as decedent's partner on July 28, 2003, unloading milk crates from a truck that was facing eastbound. Williams testified that he saw Lindsey driving a truck that was heading westbound before he stopped and began backing up in the area where decedent was working. Williams guided Lindsey back toward the area where decedent was unloading. When the truck was situated where it could be unloaded, Williams shouted and

motioned for Lindsey to stop. The truck initially stopped, however, it suddenly began rolling back. Williams was able to move away from the truck's path, but he was struck on his arm and thrown to the ground. Lindsey's truck, however, pinned decedent between it and another truck crushing his rib cage. Williams testified that he observed decedent carrying out his duties that morning which included lifting heavy boxes and entering and exiting trucks. Williams did not notice anything different or strange about decedent on that day and testified that he performed his duties without any difficulty.

Lindsey testified that on July 28, 2003, he was working as a truck driver for Open Kitchens and at the time of the incident he was approaching the delivery dock from his usual route. As Lindsey arrived near the dock, he noticed that a road was closed for a neighborhood festival. Lindsey took a different route that required him to back up toward another parked truck where Williams and decedent were unloading milk crates. He stated that he saw Williams and used him as a spotter to guide his truck into the proper location for unloading. When Lindsey "got the OK" from Williams, he began to back up. Lindsey testified that Williams yelled at him to continue backing up and that he stopped when he thought he was close enough. He stated that he heard someone yelling "whoa, whoa, did your foot slip off the brake?" Lindsey denied that his foot slipped off the brake or that his truck lurched back toward the parked truck. He stopped his truck upon hearing the shouting and moved the vehicle forward. Lindsey exited the truck and discovered that decedent had been struck by the Carmichael truck he was driving and was crushed between it and the eastbound-facing truck.

Santana Robinson, also an employee of Open Kitchens, began work at 3:30 a.m. on the

day of decedent's death. She testified that she was a helper assigned to work with Lindsey on the day at issue. Robinson was riding in the truck with Lindsey and asleep in the passenger seat when she felt the truck jerk in a manner that woke her up. Robinson testified that Lindsey said, "Oh my God, I don't know what I did, my foot slipped." Melvin Payton, an Open Kitchens helper, was stacking crates in a milk truck when he heard shouting. He turned to look in the direction of the eastbound-facing truck that decedent was unloading and observed Lindsey's truck back into decedent and crush him between the two trucks. Payton immediately phoned 911.

Plaintiff offered Arthur Atkinson as an expert in motor fleet safety. Atkinson testified that the Carmichael truck was subject to federal regulations that required Lindsey to be qualified and trained to possess a commercial driver's license (CDL). He testified to the minimum safety standards, federal regulations and industry standards. Atkinson further testified that Lindsey did not meet the minimum training requirements nor did he possess the necessary technical knowledge to properly maintain his vehicle or to safely operate it. Atkinson stated that had Lindsey avoided backing up altogether by planning a better route or exiting the truck, inspecting the area behind the truck before backing up or simply waiting for the parked truck to leave before backing and unloading, the accident would have been prevented.

Defendant Carmichael sought to admit expert testimony from Dr. O'Donnell, a pharmacologist, pharmacist and nutritionist to support one of its affirmative defenses. Carmichael alleged that decedent was under the influence of narcotics, specifically heroin, at the time leading up to his death, resulting in decedent's diminished ability to perceive, react to and

judge danger. Prior to trial, plaintiff moved to bar Dr. O'Donnell from making any references to heroin, morphine or Dr. O'Donnell's opinion regarding indications of heroin abuse based on the presence of morphine in decedent's blood following his death. Plaintiff alleged that any reference to morphine or heroin would be unduly prejudicial and irrelevant in the absence of evidence that decedent was intoxicated or impaired. Plaintiff further asserted that Dr. O'Donnell's theory was speculative and lacked a proper foundation for purposes of admissibility.

The circuit court denied plaintiff's motion to bar Dr. O'Donnell's testimony and permitted him to testify to an opinion that decedent was impaired based on the presence of morphine in his blood at the time of his death. Dr. O'Donnell, however, was prohibited from testifying that decedent was a heroin abuser based on the evidence of morphine in his blood. O'Donnell testified that decedent had between and 10 and 20 times the amount of morphine in his blood that would customarily be administered to a patient in moderate pain. He described the effect of such an amount of morphine as "molasses on your brain." It would cause confusion, disorientation, and generally impaired cognitive and motor ability. Finally, Dr. O'Donnell testified that there were no records or other indications that decedent was administered morphine by the paramedics or by anyone else at the hospital prior to his death, although he admitted on cross-examination that the paramedic who responded to the accident carried morphine and decedent was alive upon arrival at the emergency room.

At the conclusion of Dr. O'Donnell's testimony, the defense made an offer of proof that he would have testified that heroin is metabolized in the blood to morphine, that the amount of morphine found in decedent was equivalent to approximately 100 milligrams of heroin, which

would be an overdose in the average person, and that decedent's tolerance to that amount, evidenced by his ability to walk, talk and generally function, proved that he was an "every day chronic heroin addict." The circuit court rejected Carmichael's offer of proof, holding that the issue before the jury was whether decedent was impaired and thus contributorily negligent. The jury heard testimony regarding the impairing qualities of morphine and the quantity thereof in decedent's blood. The circuit court ruled that any testimony from Dr. O'Donnell with respect to his opinion that decedent became impaired as a result of chronic heroin abuse was more prejudicial than probative and barred him from testifying as such.

Sandra Logan, the mother of the beneficiaries, testified that she and decedent met in August 1983. He was 23 years old and she was 18 years old. After dating for a short period, the two began to live together, and although they never married, they continued living together continuously until decedent's death in 2003. Sandra testified that decedent wanted a big family because his parents and four of his five siblings had died. Over the years, Sandra and decedent had 13 children; however, the first child died as an infant. The girls took Sandra's last name and the boys took decedent's last name. Sandra testified that decedent acknowledged paternity to public aid agencies, he went to court to sign papers acknowledging that the children they were raising were his children and all of their children lived with her and decedent all of their lives. Logan explained that decedent was not listed on the birth certificates of the children because he was either babysitting or did not make it to the hospital in time.

Sean Taylor and Angel Logan, who were 17 and 20 years of age, respectively, testified that decedent was their father. Sean testified that decedent lived in the family home all of his

life, no one other than decedent claimed to be his father and decedent acted like his father every day and raised him and all of his brothers and sisters. Both Angel and Sean testified that decedent would wake them in the morning, make them breakfast and prepare them for school. At the end of the day, decedent would pick them up and walk them home from school. Sean and Angel testified that decedent encouraged them to stay in school, he attended school meetings regarding the children's progress and he volunteered at the school.

Antwon Taylor, age nine, testified that his father was decedent and that he called his father "Bill." Sean and Antwon testified that decedent played with them on a regular basis and that Friday night was "family night." Decedent assisted them with problems they were having and they celebrated holidays together and attended church as a family.

Josephine McCord testified that she was a pastoral associate at St. Malachy Parish in Chicago and had known decedent and his family for over 15 years from the neighborhood and from decedent's bringing the children to and picking them up from school. McCord testified that she saw decedent with the children almost every day and knew him to be a loving father to all of his children. She also testified that decedent wanted all of his children to be baptized and brought them in groups to St. Malachy's to be baptized.

Bridget Miller testified that she was the principal of St. Malachy school for 28 years. She stated that decedent joined St. Malachy's parish and enrolled some of his children in the school in 1997. Miller testified that decedent was listed as the father of the children on all of the school documents. She further testified that no other man ever acted as the children's father, decedent represented himself to her and others as the children's father and there was never a doubt in her

mind that decedent was the father of the children in question. Miller observed decedent's taking the children to school every day and picking them up from school and characterized him as a very involved parent who was attentive to any problems that arose with his children at school and took a significant interest in his children's education.

Principal Deborah Bonner testified that decedent enrolled some of the beneficiaries in Dett Elementary School, where she was principal, and that she had know him for 15 years. Bonner described decedent as a person in charge of his family, the one who made sure the children made it to school, organized the household chores and the one to check in with the children's teachers when a problem arose. She observed decedent bringing his children to Dett School and to St. Malachy's and returning to pick them up from school in the afternoon. Bonner further testified that decedent was very involved and never declined a request to assist the school with fund-raising activities or programs. He was elected to the Dett Local School Council as an advisory board member to assist the principal in making suggestions about instructional programs and to approve the budget. Bonner stated that the most important thing in decedent's life was his children.

Plaintiff offered into evidence a certified copy of an heirship order entered by the probate division of the circuit court on September 19, 2003. The order identified decedent as the father of Dominique Logan, Angel Logan, William Taylor, Duan Taylor, Sean Logan, Carrie Taylor, Kia Logan, Jordan Taylor, Juray Taylor, Matrell Taylor, Antwon Taylor, Essence Taylor, Willie Taylor and Diante Taylor. The circuit court admitted the heirship order into evidence allowing the jury to consider the order as well at the forgoing testimony for purposes of determining

paternity of the 14 children.

Following the conclusion of defendants' case-in-chief, the jury returned a verdict for $3 million in favor of plaintiff. It further found that decedent was also contributorily negligent and reduced the award by 50%. Defendants filed posttrial motions seeking a judgment notwithstanding the verdict or, in the alternative, a new trial. The circuit court denied all motions and entered judgment on the jury's verdict. Defendant Carmichael filed this timely appeal.

ANALYSIS

Vicarious Liability, the Interstate Commerce and Workers' Compensation Acts

Defendant Carmichael contends that it was entitled to judgment notwithstanding the verdict because: (1) Lindsey was immune from liability for his negligence by operation of the Workers' Compensation Act and, therefore, Carmichael could not be vicariously liable for decedent's injury and death; (2) decedent and Lindsey were considered co-employees of Carmichael under the Interstate Commerce Act (49 U.S.C. § 101 *et seq.* (2000) and, thus, the Illinois Workers' Compensation Act prohibited recovery in tort from Carmichael; and (3) decedent was not a member of the public intended to benefit from the Interstate Commerce Act. We reject each of Carmichael's theories advanced for avoiding liability and hold that the circuit court properly denied its motion for directed verdict and judgment *n.o.v.*

Carmichael first contends that Lindsey and decedent were co-employees of Open Kitchens and it is well-settled law in Illinois that an individual working within the scope of his employment may not sue a fellow employee for injuries allegedly sustained as a result of a tort. Rather, his sole remedy is a claim for benefits pursuant to the Act (820 ILCS 305/1 *et seq.* (West

2002)). In support of its proposition that Carmichael is immune from liability, it cites to Ramsey v. Morrison, 175 Ill. 2d 218 (1997), Fregeau v. Gillespie, 96 Ill. 2d 479 (1983), and Rylander v. Chicago Short Line Ry. Co., 17 Ill. 2d 618 (1959). Plaintiff concedes that decedent and Lindsey were co-employees of Open Kitchens; however, it argues that this fact has no bearing on Carmichael's vicarious liability, which is imposed pursuant to the Interstate Commerce Act and embraced in Illinois Supreme and Appellate Court authority. See Schedler v. Rowley Interstate Transportation Co., 68 Ill. 2d 7 (1977); Kreider Truck Service, Inc. v. Augustine, 76 Ill. 2d 535 (1979); Fulton v. Terra Cotta Truck Service, Inc., 266 Ill. App. 3d 609 (1994). We agree with plaintiff.

Section 5(a) of the Act states, in pertinent part:

"No common law or statutory right to recover damages from the employer *** or the agents or employees of any *** [employer] for injury or death sustained by any employee while engaged in the line of his duty as such employee, other than the compensation herein provided, is available to any employee who is covered by the provisions of this Act, to any one wholly or partially dependent upon him, the legal representatives of his estate, or any one otherwise entitled to recover damages for such injury." 820 ILCS 305/5(a) (West 2002).

It is well-settled law in Illinois that section 5(a) of the Act operates to make workers' compensation benefits the exclusive remedy of an injured employee against a negligent co-

employee acting in the course of his or her employment. Ramsey, 175 Ill. 2d at 224, citing Fregeau, 96 Ill. 2d at 486 (finding that section 5(a) of the Act operates not only to prohibit an action by the employee, but also by anyone wholly or partially dependent upon him or anyone otherwise entitled to recover damages for such injury): Rylander, 17 Ill. 2d at 628 (holding that the Act bars any action by injured employees against co-employees based on a co-employee's negligence in the course of his or her employment). Co-employee immunity is integral to a basic purpose of our workers' compensation system. The immunity granted to co-employees under the workers' compensation system is not merely gratuitous, but is tied to a basic purpose of workers' compensation. Ramsey, 175 Ill. 2d at 227-28. "[T]he basic purpose of workmen's compensation [is] to place the cost of industrial accidents upon the industry. That purpose would be blunted if the cost of those accidents was shifted from one employee to another within the industry. So far as persons within the industry are concerned, the Workmen's Compensation Act eliminated fault as a basis of liability." Rylander, 17 Ill. 2d at 628.

Under the circumstances presented here, there is no doubt that defendant Lindsey is immune from liability arising out of his negligence with respect to the performance of his duties for Open Kitchens pursuant to the Act. It is also clear from the facts that Open Kitchens is also entitled to the immunity benefits of the Act with regard to Lindsey's negligence. Although Lindsey is immune under section 5(a) of the Act for any negligent conduct, and plaintiff may not recover damages from him, this does not mean that Lindsey was not negligent or that another may not also be responsible for his negligence. Section 5(b) of the Act permits an injured employee to seek recovery for damages from another when compensation is required under the

Act. It states, in pertinent part:

>"Where the injury or death for which compensation is payable under this Act was caused under circumstances creating a legal liability for damages on the part of some person other than his employer to pay damages, then legal proceedings may be taken against such other person to recover damages notwithstanding such employer's payment of or liability to pay compensation under this Act."  820 ILCS 305/5(b) (West 2002).

Section 5(b) was enacted in order to allow both the employer and employee " 'an opportunity to reach the true offender while preventing the employee from obtaining a double recovery.' "  In re Estate of Dierkes, 191 Ill. 2d 326, 331-32 (2000), quoting J.L. Simmons Co. ex rel. Hartford Insurance Group v. Firestone Tire & Rubber Co., 108 Ill. 2d 106, 112 (1985).

Illinois also has a well-established line of authority holding that interstate carriers operating pursuant to a grant of authority evidenced by an Interstate Commerce Commission (ICC) license number and a company name displayed on a truck are vicariously liable for the negligent actions of their drivers.  See Schedler, 68 Ill. 2d 7; Kreider, 76 Ill. 2d 535; Fulton, 266 Ill. App. 3d 609.  The overarching purpose of the Interstate Commerce Act, relevant to our analysis here, is to protect members of the public injured by trucks operating on public roadways by dispensing with issues of agency and scope of employment, and instead fixing and placing full vicarious responsibility on the carrier for the negligent operations of its vehicles.  Kreider, 76 Ill. 2d at 541-42.  See also Schedler, 68 Ill. 2d at 12-13 (finding that was the purpose of the

regulatory scheme that the carrier-lessee be vicariously responsible to the public for the negligent operation of the leased vehicle without regard to whether at the time in question it was being used in the business of the lessee). This is commonly referred to as "logo liability" or "placard liability" and operates to hold federally authorized carriers, such as Carmichael, that are licensed by the United States Department of Transportation (USDOT) and display their USDOT certificate number on their trucks, vicariously liable for the negligence of drivers operating under a lease. Schedler, 68 Ill. 2d 7; Kreider, 76 Ill. 2d 535; Fulton, 266 Ill. App. 3d 609.

The Interstate Commerce Act and the corresponding regulations were created in order to correct widespread abuses by authorized interstate carriers that would immunize themselves from liability to the public by leasing trucks from third parties. American Trucking Associations, Inc., v. United States, 344 U.S. 298, 303, 97 L. Ed. 337, 352, 73 S. Ct. 307, 311 (1953). It is clear that the ultimate goal of the federal statute and the implementing regulations is to make a carrier under the Interstate Commerce Act liable for those injuries caused to the traveling public which arise out of the negligent operation of any vehicle leased to it and operated under its ICC permit. See Transamerican Freight Lines, Inc. v. Brada Miller Freight Systems, Inc., 423 U.S. 28, 46 L. Ed. 2d 169, 96 S. Ct. 229 (1975). In Transamerican Freight, the court stated:

> "[T]he Commission has developed and designed its
> responsibility-and-control regulations in order to prevent a sharing
> of operating authority under the guise of a lease of equipment.
> With only special exceptions, the regulations require the lessee to
> ship under its own bill of lading, to compensate the lessor on an

established basis, to inspect the equipment, and to assume full control and responsibility for the operation. *** The regulations, however, do not require the lessee itself to operate the equipment; the lessor may perform that task by furnishing the driver with the equipment. But the lessee must assume the responsibility for the shipment and have full authority to control it." Transamerican Freight, 423 U.S. at 36, 46 L. Ed. 2d at 176, 96 S. Ct. at 233.

In the instant case, it is not disputed that Carmichael is a common carrier licensed to operate under the Interstate Commerce Act. Further, although Carmichael is not the lessee here, it is also undisputed that Carmichael owned the truck that Lindsey operated on the day of the accident and it bore Carmichael's ICC number and corporate name. We agree with the circuit court that the situation here is one in which the Interstate Commerce Act applies and that it functions to impose vicarious liability upon the carrier for the negligence of the driver, Lindsey. See Schedler, 68 Ill. 2d 7; Kreider, 76 Ill. 2d 535; Fulton, 266 Ill. App. 3d 609.

Contrary, however, to Carmichael's assertion, we find nothing in the Act, Illinois case law or the Interstate Commerce Act to support Carmichael's theory that it should enjoy the immunity afforded to employers and co-workers of negligent employees through the Act. The Act, in our view, contemplates that the employer that pays for workers' compensation coverage, and upon which the costs of workplace injuries fall, will benefit from the immunity afforded under the Act. Carmichael does not and cannot articulate a logical explanation supporting its conclusion that because Lindsey is immune for liability for damages as a co-employee of

-14-

decedent and employee of Open Kitchens, which provided workers' compensation benefits, that it should also enjoy the same immunity. Carmichael did not pay premiums for workers' compensation coverage for either Lindsey or decedent. It did not have an employer-employee relationship with either individual or any relationship with Open Kitchens other than the lease agreement that was in effect at the time of the accident.

Furthermore, the cases upon which Carmichael relies are inapposite because each of those cases deals with claims against an employer of co-employees, such as Open Kitchens or an employer who borrows an employee from another employer. See Evans v. Abbott Products Inc., 150 Ill. App. 3d 845, 849 (1986) (holding that borrowing employer's temporary right to control work activities and right to dismiss claimant from his temporary job and direct him back to lending employer created an employer-employee relationship and afforded immunity to the borrowing employer under the Act); Saldana v. Wirtz Cartage Co., 74 Ill. 2d 379 (1978) (finding that the Act allows one injured while working for a special or borrowing employer is entitled to receive workmen's compensation benefits from that special employer if that employee is under the direction or control of the borrowing employer); Highway Insurance Co. v. Sears, Roebuck & Co., 92 Ill. App. 2d 214, 221 (1968) (ruling that where business supplying temporary labor to various firms had resigned full control of the plaintiff for time being and the plaintiff was doing all his work under direction and control of the defendant, who had right to terminate the relationship and to direct the plaintiff to report back to business supplying labor, the plaintiff was a "loaned employee" of the defendant within the meaning of the Act and barred personal injury action by the plaintiff against the defendant). In Walker v. Midwest Emery Freight Systems, 119

Ill. App. 3d 640, 646 (1983), this court held that a truck driver who claimed to be an independent contractor for the defendant was in fact an employee based on the facts which included the defendant's right to control the plaintiff truck driver, to have exclusive use and possession of the equipment and the obligation to pay for unemployment tax, social security tax and to award the plaintiff seniority rights. Walker, 119 Ill. App. 3d at 646.

Essentially, Carmichael claims that because decedent was injured while at work by a co-employee, plaintiff's ability to recover from third parties is cut off and the immunity afforded by the Act reaches to non-employers such as Carmichael. We find no reason to apply the benefits to which employers and co-employees are entitled under the Act to an unrelated common carrier such as Carmichael. We do not interpret section 5(a) of the Act to bar recovery from anyone and everyone who may be liable for the negligent conduct of someone who happens to be a co-employee of the injured party. This is especially true here because decedent was a complete stranger to Carmichael. He had no employment obligations to Carmichael and Carmichael had no obligations to him as an employer. There was no evidence that Carmichael paid for workers' compensation insurance coverage for decedent or Lindsey and no evidence that decedent knew that Open Kitchens leased trucks from Carmichael or that Carmichael even existed.

As a result, we find that Carmichael is not immune from liability because the Act does not offer immunity to third parties who are vicariously liable for an otherwise immune co-employee's negligent conduct. Further, the purpose of the Act would be violated by allowing Carmichael to take advantage of the immunity offered to employers and co-employees where Carmichael did not have an employee-employer relationship with decedent and did not undertake

to provide workers' compensation coverage for decedent or Lindsey as an employee. Moreover, the purpose of the Interstate Commerce Act, which is to make the carriers liable for the negligence of drivers, would not be advanced if we were to hold that section 5(a) of the Act prohibits plaintiff from seeking damages from a licensed carrier under these circumstances.

Carmichael next argues that it is entitled to immunity under the Act because decedent and Lindsey are considered "statutory employees" of Carmichael pursuant to the definition of employee in 49 C.F.R. 390.5. Section 390.5 of title 49 of the Code of Federal Regulations defines an employee, in relevant part:

> "*Employee* means any individual, other than an employer,
> who is employed by an employer and who in the course of his or
> her employment directly affects commercial motor vehicle safety.
> Such term includes a driver of a commercial motor vehicle
> (including an independent contractor while in the course of
> operating a commercial motor vehicle), a mechanic, and a freight
> handler." 49 C.F.R. 390.5 (2008).

According to Carmichael, it would be immune from an action in under section 5(a) of the Act based on the regulations because decedent, Payton, Robinson and Williams were all freight handlers and engaged in activity directly affecting commercial motor vehicle safety, thereby making them all employees of Carmichael. We disagree.

Although Illinois courts have held that entities subject to the Interstate Commerce Act and its rules would be required to assume responsibility for the negligence of the drivers of

vehicles based on lease agreements "as if those drivers were employees" (see generally Walker, 119 Ill. App. 3d at 646; Hershberger v. Home Transport Co., 103 Ill. App. 3d 348, 351 (1982); Schedler v. Rowley Interstate Transportation Co., 37 Ill. App. 3d 433, 439 (1976) (Dixon, J., dissenting)), there is nothing to suggest that this vicarious liability concept was intended to effect the rights and responsibilities of employers and employees under the Act. In those instances where vicarious liability was applied, an employee relationship was said to have existed if the interstate carrier had a lease agreement in place with operators or owner-operators, the carrier was subject to the Interstate Commerce Act and displayed their business names and ICC numbers on the vehicle. Schedler, 68 Ill. 2d 7; Kreider, 76 Ill. 2d 535; Fulton, 266 Ill. App. 3d 609. Despite the fact that the interstate carrier would be vicariously liable for the driver's negligence just as if she were its employee, we have also stated "that any employee status resulting solely from the statutory requirements is a fiction which exists only to insure the [interstate carrier's] responsibility to shippers and members of the general public and not to create an employment relationship for workers' compensation programs." Walker, 119 Ill. App. 3d at 646-47, citing Riddle v. Trans-Cold Express, Inc., 530 F. Supp. 186, 189 (S.D. Ill. 1982).

We hold that under the fact of this case that the employee relationship referred to between Lindsey and Carmichael, via logo liability, is a legal fiction that neither has an effect on nor is affected by the Act but, rather, is simply a designation by virtue of the Interstate Commerce Act for purposes of protecting the public. Carmichael's assertion that it is immune from liability because decedent was a "statutory employee" must therefore fail.

Next, defendants claim that even if section 5(a) of the Act does not prohibit plaintiff from

pursuing his negligence claim, Carmichael cannot be liable because decedent was not a member of the traveling public intended to be protected under the Interstate Commerce Act. Carmichael notes that no Illinois case has addressed the facts before us or has decided whether a freight handler like decedent and a co-employee of the negligent driver is a member of the traveling public for purposes of the Interstate Commerce Act. The circuit court, however, concluded that decedent was indeed a member of the traveling public and plaintiff urges us to adopt the reasoning of the federal court in Proctor v. Colonial Refrigerated Transportation, Inc., 494 F.2d 89 (4th Cir. 1974), and its progeny. In Proctor, the plaintiff there was injured while riding as a passenger in a truck that had been leased to Colonial, an interstate carrier, by Bales, the owner-operator of the truck. Bales had hired the plaintiff as an assistant driver of the leased truck. While transporting Colonial's items, pursuant to the lease agreement, the truck was involved in a collision with another truck, which killed Bales and seriously injured the plaintiff. Proctor, 494 F.2d at 90.

In the federal district court, the jury found that Bales was an independent contractor at the time of the accident and returned a verdict in favor of Colonial. The United States Court of Appeals, Fourth Circuit, reversed and held that federal law eliminated the concepts of independent contractors and required Colonial to assume responsibility for the negligence of Bales as the driver of the leased vehicle. Proctor, 494 F.2d at 91. Although Colonial argued that its statutory liability did not extend to the plaintiff, who had been injured while acting as an employee for the lessor Bales, the court emphasized that the plaintiff had not been the owner of the vehicle and had no contractual relationship with Colonial. The court ultimately concluded

that the plaintiff "was as much a stranger to Colonial as a shipper or a member of the traveling public, and to deny him recovery upon the independent contractor theory would undercut the primary purpose of the regulatory design." Proctor, 494 F. 2d at 92.

In addition, there are four sister jurisdictions that have also considered this issue and have adopted the reasoning articulated by the court in Proctor. In Stonerock v. Miller Brothers Paving, Inc., 72 Ohio App. 3d 123, 594 N.E.2d 94 (1991), the decedent who was a helper on a truck that was driven by Tong was killed in a collision between the truck in which he was a passenger and an unoccupied dump truck. Tong operated the truck pursuant to a lease agreement between Trowbridge Storage Company and United Van Lines. The decedent's widow brought suit against United alleging negligence based a theory that liability was statutorily imposed against it as an interstate carrier permit holder and, as a motor carrier, it was responsible for the negligence of the personnel furnished by the agent from whom the carrier leased the truck at issue. Stonerock, 72 Ohio App. 3d at 126, 594 N.E.2d at 97. The trial court held that decedent was a member of the traveling public as a matter of law and that United was not eligible to seek immunity under the Ohio workers' compensation statutes. The jury returned a verdict in favor of the decedent's estate and United appealed alleging that decedent was not a member of the traveling public and thus not contemplated as an individual protected under the Interstate Commerce Act. Stonerock, 72 Ohio App. 3d at 128, 594 N.E.2d at 97. The Ohio Appellate Court affirmed the trial court's ruling that the decedent was a member of the public as a matter of law, finding that "such a view is consistent with the purposes sought to be achieved by the federal law" based on Proctor and the intent of the Interstate Commerce Act. Stonerock, 72 Ohio

App. 3d at 131, 594 N.E.2d at 100.

In Schindele v. Ulrich, 268 N.W.2d 547 (Minn. 1978), the plaintiff and another individual were employed by the lessor to drive a truck that had been leased to an interstate carrier. The plaintiff suffered injuries when his co-driver negligently caused an accident. While the carrier argued that it could not be held liable for the plaintiff's injuries on the basis that at the time of the accident the plaintiff was an employee of the lessor, the Minnesota Supreme Court disagreed and relying upon the Proctor decision held:

> "[W]e think the lessee's assumption of 'full responsibility in
>
> respect to the equipment it is operating' requires it to assume
>
> liability to a codriver for injury caused by the driver's negligence."
>
> Schindele, 268 N.W.2d at 551.

Similarly, in Matkins v. Zero Refrigerated Lines, Inc., 93 N.M. 511, 602 P.2d 195 (App. 1979), the estate of a deceased passenger who had been hired by the lessor as an assistant driver brought suit against the carrier for damages arising out of the decedent's death when his co-driver negligently operated the leased truck. The New Mexico Appellate Court held that the lessee was liable for the resulting damages caused when an employee of the lessor was killed while riding in the leased truck. Again, relying on Proctor, the New Mexico court held:

> "One of the principal goals of the ICC regulation imposing
>
> responsibility on the carrier was to provide the public with
>
> financially responsible carriers. [Citation.] In acknowledgment of
>
> that purpose, Proctor reasoned that plaintiff, although an employee

of the negligent driver and a passenger in the truck driven by him,
was as entitled to the protection intended by the Commission's
regulations as any other member of the traveling public. We feel
that plaintiff here, representing the estate of deceased, is entitled to
the same protection under the ICC regulations, and to deny him the
right to seek recovery from the carrier would undercut one of the
primary purposes of the regulatory pattern." Matkins, 93 N.M. at
516, 602 P.2d at 200.

In Wilkerson v. Allied Van Lines, Inc., 360 Pa. Super. 523, 521 A.2d 25 (1987), the court relied upon the decision in Proctor, applying the protection of the federal regulations and statutes to the plaintiff who was injured when he was a passenger in a truck which was involved in interstate commerce. The truck was owned and operated by Jordan, who leased the truck to Fisher & Brother, Inc., which, in turn, had leased the truck to Allied Van Lines, Inc. The plaintiff had been hired by Jordan to act as a helper whose responsibilities were to load and unload trucks and, after completing his work, Jordan would provide transportation to the plaintiff so that he could reach a destination convenient to him. While plaintiff was working as a helper, an accident occurred that caused serious injury to the plaintiff. The Wilkerson court stated:

"To hold that Wilkerson was not entitled to recover from the
carrier under whose certificate of necessity the truck was being
operated would defeat the salutary purpose of ensuring
compensation for innocent persons who have been injured as a

consequence of the carrier's doing business. Although it is true that Jordan, as lessor, could not have recovered from the carrier if he had been injured by his own negligence, or the negligence of one of his employees, Wilkerson had no direct relationship with the carrier and no ownership interest in the leased vehicle. Therefore, he was a member of the public intended to be benefitted by the vicarious liability provisions of federal law. He was a member of the public within the intendment of federal law, and, as such, could recover against Allied for the negligence of Jordan." Wilkerson, 360 Pa. Super. at 532, 521 A.2d at 30.

We find, as the Wilkerson court found, that the Proctor approach is consistent with and true to the intent of the Interstate Commerce Act and the decisions of our supreme court regarding "logo liability." See Schedler, 68 Ill. 2d 7; Kreider, 76 Ill. 2d 535; Fulton, 266 Ill. App. 3d 609. In the case sub judice, decedent was not an employee of defendant Carmichael. He was an employee of Open Kitchens who regularly worked loading and unloading food from trucks at the direction of Open Kitchens. Decedent was not a co-driver of Lindsey's truck, nor was he ever in Lindsey's truck before the day he was struck and killed by Lindsey. Decedent had no interest in the equipment or lease agreement at issue, was neither paid nor controlled by Carmichael and there is no evidence decedent even knew of the relationship between Open Kitchens and Carmichael. There is, in our view, no basis to conclude that decedent was anything other than a member of the public under the circumstances presented in this case. Accordingly,

1-07-2606

we hold that decedent was a member of the public intended to be protected under the Interstate Commerce Act.

Next of Kin and Establishment of Parentage

Carmichael contends that plaintiff failed as a matter of law to establish that decedent was the biological father of the children who claimed to be beneficiaries of the estate. Carmichael claims that plaintiff did not prove that decedent was the father of the beneficiaries according to the Illinois Probate Act (Probate Act) (755 ILCS 5/2-1 (West 2002)); the Illinois Parentage Act of 1984 (750 ILCS 45/6) (West 2002)); and the Wrongful Death Act (740 ILCS 180/2 *et. seq.* (West 2002)). Specifically, Carmichael argues that although plaintiff may have proved that the 14 individuals were heirs to the estate, it failed to establish by clear and convincing evidence that the alleged beneficiaries were decedent's next of kin for purposes of recovering damages under the Wrongful Death Act. We disagree.

The burden of proof applied to a litigant in establishing parentage is clear and convincing evidence. In re Estate of Willis, 214 Ill. App. 3d 683, 688 (1991). The Parentage Act provides that "[t]he parent and child relationship *** extends equally to every child and to every parent, regardless of the marital status of the parents." 750 ILCS 45/3 (West 2002); J.S.A. v. M.H., 224 Ill. 2d 182, 198 (2007). Accordingly, under the Parentage Act, a father-child relationship may be established in a number of ways: by presumption, by consent or by judicial determination. J.S.A., 224 Ill. 2d at 198; In re Parentage of John M., 212 Ill. 2d 253, 263 (2004). In order to reverse a trial court's finding that a party met its burden with clear and convincing evidence, we must conclude that this finding was against the manifest weight of the evidence. In re M.M., 303 Ill.

-24-

App. 3d 559, 565 (1999).  A decision is against the manifest weight of the evidence only where the opposite result is clearly evident or where the determination is unreasonable, arbitrary, and not based on the evidence presented.  In re S.R., 326 Ill. App. 3d 356, 360-61 (2001).

We find it important to point out that Carmichael presented no evidence to rebut the evidence plaintiff admitted at trial, which included a valid, signed order of heirship from the probate court and testimony from several witnesses about decedent's paternal relationship with the putative children he was raising with their mother.  In addition, Sandra Logan, the children's mother, testified that she and decedent met in 1983 and lived together as husband and wife but they never married.  Sean and Angel testified that the boys were given decedent's last name and the girls were given Sandra's last name.  Sandra further testified that decedent signed all public aid documents as father of the children required to receive benefits from the government.  Bridget Miller, principal of the school attended by some of the children, testified that decedent was listed on all of the school records as the children's father.  Miller testified that decedent acknowledged the children as his own and assumed all responsibility for the children as their father.

Carmichael claims that the testimony and probate court order is insufficient and that without more, plaintiff has failed, as a matter of law, to carry its burden of proving the children's parentage.  In support of its contention, Carmichael cites to Foster v. Englewood Hospital Ass'n, 19 Ill. App. 3d 1055, 1068  (1974) for the proposition that an order of heirship from the circuit court is entitled to no weight in a wrongful death case.  The Foster court, however, made no such holding, and we find that case to be distinguishable on the facts.  The court there did not accept

the order of heirship because it was both undated and unsigned by the court. Foster, 19 Ill. App. 3d at 1068.

Illinois courts have held that a written acknowledgment of paternity is not required and that proof offered by way of testimonial and documentary evidence, uncontradicted by a disinterested witness, is sufficient to prove paternity. Brice v. Estate of White, 344 Ill. App. 3d 995, 997-98 (2003), citing Kennedy v. Kennedy, 93 Ill. App. 3d 88, 92 (1981). Our supreme court has addressed this very issue as far back as 1905 in Miller v. Pennington, 218 Ill. 220 (1905), where a decedent was living with his first wife with whom he had four children. His wife's cousin, an unmarried woman, had two children: one in 1864 and the other in 1865. Years later, in 1902, decedent married the mother of the illegitimate children and lived with her until his death some two years later. He acknowledged to a number of people that he was the father of the two children. Many of these disinterested persons testified in the case. However, there was a significant amount of testimonial evidence of other witnesses that he had denied to them that he was the father of the parties and that such denials were made both before and after he married their mother. The Pennington court stated:

> "[The] acknowledgment required by the statute is a general
> and public one; that the father must show, by his acts, words and
> treatment of the child, that he regards, and desires the public to
> regard, it as his legitimate offspring and that all his acts and words,
> taken together, must show that he intends to make the child
> legitimate ***." Pennington, 218 Ill. at 224.

-26-

The <u>Pennington</u> court further observed that "no matter what the purpose of the acknowledgment was or whether the father intended to make the child his heir, the acknowledgment fixes the status of the child which cannot be changed by anything the mother or father might say afterward." <u>Brice</u>, 344 Ill. App. 3d at 998, citing <u>Pennington</u>, 218 Ill. at 226. In other words, " 'Having removed the "bar sinister," they cannot replace it.' " <u>Pennington</u>, 218 Ill. at 226, quoting <u>Brock v. State</u>, 85 Ind. 397, 399 (1882). In the instant case, unlike the facts in <u>Pennington</u>, there was no evidence admitted at trial to rebut decedent's parentage. The testimony from Sandra, the children and principal Miller, taken together with the valid, certified order of heirship is overwhelming evidence, especially in light of the fact that Carmichael has no evidence to rebut the children's parentage. We therefore find that plaintiff proved by clear and convincing evidence that decedent was the children's father under the Illinois Parentage Act.

Evidentiary Errors

Carmichael alleges various evidentiary errors on the part of the circuit court, including allowing evidence of Lindsey's failure to obtain a commercial driver's license and lack of experience, allowing testimony that the accident at issue was preventable, and barring evidence of decedent's alleged chronic heroin use, and that the effect of cumulative error merits a new trial. The admission of evidence is within the sound discretion of a trial court, and a reviewing court will not reverse the trial court absent a showing of an abuse of that discretion. <u>Snelson v. Kamm</u>, 204 Ill. 2d 1 (2003). An abuse of discretion occurs when no reasonable person would take the view adopted by the trial court. <u>Bauer v. Memorial Hospital</u>, 377 Ill. App. 3d 895, 912 (2007). Moreover, a party is not entitled to a reversal based upon rulings on evidence unless the

error was substantially prejudicial and affected the outcome of the trial. <u>Simmons v. Garces</u>, 198 Ill. 2d 541, 566-67 (2002). We have reviewed Carmichael's arguments and the record and find the alleged evidentiary error to be without merit, and even if Carmichael's claims amounted to error, it would not have effected the outcome of the trial.

First, we note that Carmichael alleges that the circuit court erred by allowing certain evidence to be admitted with regard to plaintiff's theory of negligent entrustment. Specifically, that evidence relating to Lindsey's lack of proper licencing were improper, cumulative and prejudicial and the circuit court should not have given the jury Illinois Pattern Jury Instructions Civil, No. 105.01 (2000) (hereinafter IPI Civil (2000)). Plaintiff, in its reply brief, points out, and the record confirms, that the circuit court did not instruct the jury on a theory of negligent entrustment nor issue IPI Civil (2000) No. 105.01 to the jury. The circuit court in fact advised the jury that it would not be called upon to decide whether Carmichael was negligent, but that it must only determine whether Lindsey was negligent. The jury was further instructed that if it found Lindsey to be liable, then Carmichael would be vicariously liable, as a matter of law. Carmichael concedes the issue in its reply brief.

Second, defendant's contention that the circuit court allowed a modified jury instruction on Lindsey's professional negligence and improper licensing to be admitted over Carmichael's objection is simply untrue. The record reveals that Carmichael objected to modified IPI Civil (2000) No. 20.01, the circuit court sustained its objection and it was not given to the jury. We can find neither a time in the trial where the jury was advised nor an instruction to "consider the lack of licensure as negligence" as Carmichael claims in its brief. In fact, the word "license"

does not appear anywhere in the issues instructions. We therefore hold that Carmichael's claims with regard to improper jury instruction and argument pertaining to negligent entrustment are without merit.

Next, Carmichael argues that the circuit court erred in allowing Atkinson to testify as an expert that the accident at issue was preventable and by barring Dr. O'Donnell's testimony of decedent's alleged chronic heroin use. With regard to Carmichael's claim that Atkinson's testimony improperly referred to preventability, we do not view the Atkinson testimony as improper. The testimony was elicited to advise the jury on the recognizable risk of Lindsey's conduct and the basis for concluding that the harm flowing from the consummation of that risk was reasonable preventable. See Heiden v. Cummings, 337 Ill. App. 3d 584, 587 (2008), citing Rinaldo v. McGovern, 78 N.Y.2d 729, 733, 587 N.E.2d 264, 267, 579 N.Y.S.2d 626, 629 (1991). Nevertheless, even if we were to conclude that the testimony was improperly admitted, the law is clear that the erroneous admission of testimony does not constitute grounds for reversal where there was sufficient competent evidence to support the ruling. Cochrane's of Champaign, Inc. v. Illinois Liquor Control Comm'n, 285 Ill. App. 3d 28, 32 (1996), citing Abrahamson v. Illinois Department of Professional Regulation, 153 Ill. 2d 76, 94 (1992). In any event, not every error requires reversal. " ' "Where it appears that an error did not affect the outcome below, or where the court can see from the entire record that no injury has been done, the judgment or decree will not be disturbed." [Citation.]' " Simmons, 198 Ill. 2d at 566-67. Because the evidence of Lindsey's negligence even without Atkinson's testimony was overwhelming and the alleged error does not appear to have prejudiced Carmichael or affected the outcome below, we

find that reversal is not warranted on this basis.

Carmichael also asserts that barring Dr. O'Donnell from testifying that high levels of morphine in decedent's blood samples taken postmortem was conclusive proof that he was a chronic heroin abuser was an abuse of discretion. In this case, the only established fact underlying Dr. O'Donnell's opinion was the postmortem finding of morphine in decedent's blood. From this single fact, Dr. O'Donnell would testify as an expert that heroin metabolizes to morphine in the blood and that the amount of morphine found in decedent's blood showed that he injected approximately 100 milligrams of heroin on the morning of his death. Simply put, Carmichael desired to tell the jury that decedent was a heroin addict because there was morphine in his blood. We, however, agree with the circuit court that Dr. O'Donnell's theory was speculative, lacked a foundation for its admission and was highly prejudicial, especially since he did not perform analyses of his own and relied on the autopsy report. That report made no mention of any evidence of drug abuse. Hiscott v. Peters, 324 Ill. App. 3d 114, 123 (2001) (holding that where essential facts are missing from the expert's opinion, that opinion is as much guesswork as conjecture as would be the jury's finding absent essential and basic fact and has no probative value). We further note that Dr. O'Donnell was permitted to testify that decedent somehow ingested morphine prior to his death in an amount that was higher than a level normally found in an individual under these circumstances. The jury was free to draw any and all reasonable inferences from Dr. O'Donnell's testimony regarding impairment due to the presence of morphine in decedent's blood, including inferences that decedent was contributorily negligent or that the economic value of his life was diminished as a result. If, however, any conceivable

error occurred, we conclude it was not reversible because we cannot discern any prejudice to Carmichael especially where the jury reduced the estate's recovery by 50% based on decedent's contributory negligence.

Cumulative Error

Defendant Carmichael's final claim, as far as we can determine from its argument, is that it is entitled to a new trial as a result of the cumulative effect of multiple errors. Carmichael's brief states that "defendants were severely prejudiced through questioning on improper subjects, questioning on matters barred in limine, comments by plaintiff's expert Atkinson, and the improper subject matter was highlighted during argument. Defendants were prejudiced as a result of the admissibility of evidence pertaining to negligent entrustment matters, preventability, and licensure. Defendants did not receive a fair trial." Carmichael does not identify any specific error or explain what prejudice was suffered or offer any examples of unfairness in this portion of its argument.

A reviewing court is entitled to have the issues clearly defined and supported by pertinent authority and cohesive arguments; it is not merely a repository into which an appellant may "dump the burden of argument and research," nor is it the obligation of the this court to act as an advocate or seek error in the record. Orbert v. Saville, 253 Ill. App. 3d 677, 687 (1993); 210 Ill. 2d R. 341(h)(7). Supreme Court Rule 341 requires that the appellant clearly set out the issues raised and the legal support therefore with relevant authority. Willaby v. Bendersky, 383 Ill. App. 3d 853, 861 (2008). The consequence of not complying with Supreme Court Rule 341 is waiver of those issues on appeal. Universal Casualty Co. v. Lopez, 376 Ill. App. 3d 459, 465

1-07-2606

(2007) (holding that arguments not supported by relevant authority and coherent legal argument are waived). We find that Carmichael has waived any claim that it was denied a fair trial based on cumulative effect of the undisclosed evidentiary errors that occurred at trial.

To the extent that Carmichael claims that it was denied a fair trial based on the cumulative effect of the alleged errors that it identified in its brief, we find that none were in fact error, and even if all of the evidentiary rulings of which Carmichael complains were error, we hold that they would neither individually nor cumulatively require reversal of the jury's verdict in this case.

CONCLUSION

For the foregoing reasons, we hold that Carmichael was not entitled to immunity for Lindsey's negligence under the Act and that decedent was a member of the traveling public for purposes of the Interstate Commerce Act. Plaintiff met its burden and proved by clear and convincing evidence that decedent was the father of the beneficiaries. Finally, the circuit court did not commit error in its evidentiary rulings and any error that may have occurred was harmless and not reversible either individually or cumulatively. Accordingly, the judgment of the circuit court is affirmed.

Affirmed.

GARCIA and LAMPKIN, JJ., concur.