2020 IL App (1st) 182554-U

FIFTH DIVISION
February 21, 2020

No. 1-18-2554

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT
_____

| | | |
|---|---|---|
| NEDER CAPITAL SERVICES, LLC, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 M1 720486 |
| | ) | |
| | ) | Honorable |
| TODD HUYNH and DONNA HUYNH, | ) | Elizabeth Karkula and |
| | ) | Robert Harris, |
| Defendants-Appellants. | ) | Judges, presiding. |

_____

JUSTICE DELORT delivered the judgment of the court.
Presiding Justice Hoffman and Justice Rochford concurred in the judgment.

**ORDER**

¶ 1    *Held:*    The circuit court did not abuse its discretion in allowing plaintiff's motion to amend the complaint or in denying defendants' untimely motion to transfer the case. The court's judgment in favor of plaintiff was not against the manifest weight of the evidence. The award of attorney fees was not an abuse of discretion.

¶ 2                              I. BACKGROUND

¶ 3     Todd and Donna Huynh (the Huynhs)[1] leased a unit in a strip mall, out of which they ran

a social club. The original lease was for the term December 1, 2013 through November 30, 2015.

The lease included two options to renew the tenancy for additional five-year terms each "with a

3% [rent] increase each year". The options were to "be exercised by Tenant in writing to Landlord

not less than one [*sic*] 4 months or 120 days prior to the expiration date of the then current term".

The lease also included a schedule of prospective rents for each year of the option periods. The

parties to the original lease were the Huynhs and ZV Management Company.

¶ 4     The owner of the strip mall apparently defaulted on its mortgage. In the summer of 2015,

MRSS Holding LLC-3678 Elston (MRSS) purchased the property at a sheriff's sale. MRSS

received an assignment of leases from the foreclosing bank. In September 2016, MRSS

quitclaimed the property to Neder Capital Services, LLC (Neder Capital).

¶ 5     On December 6, 2017, MRSS filed an eviction complaint against the Huynhs.[2] The

complaint alleged that MRSS was entitled to possession of the property and that the Huynhs

owed MRSS over $15,000 in unpaid rent for February 2017 through November 2017. The

complaint also requested attorney fees and costs. Although the complaint was labeled "verified",

it did not include a verification or any exhibits.

¶ 6     Before the Huynhs appeared in the case, counsel for MRSS made an oral motion to

amend the complaint and substitute Neder Capital as plaintiff. The circuit court granted the

---

[1] Throughout the record—and even in their own briefs—the spellings of the appellants' names are inconsistent. Todd sometimes appears as "Toddy" and their last name appears as "Hyunh", "Hyuhn", or "Huynh". We have adopted the spelling given by Todd on the witness stand.
[2] On January 1, 2018, one day before the Huynhs filed their appearance, the Forcible Entry and Detainer Act (735 ILCS 5/9-101 *et seq.* (West 2016)) was renamed as the Eviction Act. This order uses the current statutory terminology.

motion,[3] and Neder Capital filed an amended complaint the same day. Aside from the substitution of Neder Capital for MRSS, the amended complaint was identical to the original complaint.

¶ 7       On January 2, 2018, the Huynhs' trial (and appellate) counsel filed an appearance on their behalf. The appearance did not include a jury demand. Shortly thereafter, the Huynhs moved for summary judgment. They argued that they had not received appropriate notice of termination of tenancy under the Eviction Act (Act) (735 ILCS 5/9-101 *et seq.* (West 2016)) and that the lessor was not a "valid entity in the State of Illinois."[4] The parties filed briefs, the circuit court heard oral argument, and, on March 13, 2018, the court denied the motion for summary judgment and set a trial date of March 29, 2018.

¶ 8       On March 16, 2018, the Huynhs filed a motion to reassign the case to a jury call. Because the presentment date for that motion would have been the day after trial was set to begin, they filed an additional "emergency motion to move case to jury section and set a new trial date". On March 23, 2018, the circuit court denied the motions to reassign the case because the court had already made substantive rulings. However, the court granted the motion to continue the trial date and acknowledged that, because the Huynhs had vacated the property, possession was no longer an issue.

---

[3] As the Huynhs point out, the circuit court's order of December 27, 2017 refers to the oral motion to amend the complaint but is missing the language "is granted". This apparent oversight was corrected in a later order, in which the court formally modified the caption of the case "to show Neder Capital Services, LLC as the sole plaintiff. MRSS Holdings is no longer a party plaintiff."

[4] The motion for summary judgment also argued that the Huynhs' names were misspelled in the eviction notice. Ironically, the spelling given by Todd at trial is consistent with the spelling in the notice, not the spelling in the motion for summary judgment.

¶ 9    On April 6, 2018, the court granted the Huynhs leave to file an answer and to initiate discovery. On April 13, 2018, the Huynhs filed an answer to the amended complaint, denying every allegation. The Huynhs also raised four affirmative defenses: (1) the statute of frauds, (2) that the named plaintiff was not a proper party, (3) that they were entitled to setoffs for amounts paid toward taxes and management charges, and (4) that they had been constructively evicted. They also filed a counterclaim for breach of contract, alleging that the inadequate building maintenance underlying their constructive eviction defense also caused their social club to lose members and revenue. On May 15, 2018, the Huynhs filed an emergency motion to file additional defenses and counterclaims based on the Rental Property Utility Service Act (765 ILCS 735/0.01 *et seq.* (West 2016)) and the Tenant Utility Payment Disclosure Act (765 ILCS 740/1 *et seq.* (West 2016)). The next day, the court granted leave for the Huynhs to file their amended pleading *instanter*.

¶ 10    The trial began two days later, on May 18, 2018. That morning, the court offered an admonition that proved more prophetic than effective: "if you're going to have an objection for every single question that's asked, this is going to take a month to get through what should be a very simple trial." In fact, the trial sprawled across nine days over the course of nearly four months, with several witnesses taking the stand multiple times. We limit our recital of the trial evidence to those facts essential for our review.

¶ 11    Todd testified that he and Donna signed the original lease, a copy of which was entered into evidence. Neder Capital also entered into evidence a copy of an email from Todd to Megan Hunter, a former employee of Neder Capital.[5] The email read, in its entirety: "Megan, I would like

---

[5] In their brief, the Huynhs claim that Hunter testified at trial. Neder Capital claims that she did not. Hunter was sworn in as a witness on the first day of trial but was promptly excluded from the courtroom. The record before us does not contain a transcript of any testimony by Hunter, but

to use my option to renew the lease on [the property]. Thank you. Todd Huynh". He testified that he did not receive any response to that email.

¶ 12    Todd also testified that the Huynhs retained possession of the property after the original expiration date of the lease, and that they continued pay rent. He testified that he paid rent through October 2017 but did not pay rent thereafter. He testified that he returned the keys to the property in the end of January 2018.

¶ 13    Todd testified that the unit had serious recurring issues with leaks in the ceiling. He described two videos he had taken of water leaking from the ceiling in 2016 and testified that infiltrating water filled several bucketsful.[6] Todd also testified that the heating and air conditioning for the property were generally insufficient. He testified that he complained about the heat and air conditioning on multiple occasions, but usually did not receive any response. In particular, he testified about text messages he sent throughout 2017, in which he complained that the business could not open without appropriate climate control. On cold days, Todd testified, members of the social club would keep their winter coats on indoors. He testified that the lack of heat forced them to close the business for several weeks in January and February 2017. He also testified that the plumbing in the whole building would occasionally clog, making their toilet inoperable.

---

at least twice during the trial the Huynhs' counsel made references to her having testified. Because the trial was spread across so many days and sessions, it is difficult to determine whether any testimony is missing from the record. To the extent that the Huynhs rely on anything Hunter might have testified to, we resolve any doubt about her testimony against the Huynhs because it was their obligation to provide a complete record. See *Foutch v. O'Bryant*, 99 Ill. 2d 389, 392 (1984).

[6] Although the videos were shown to the court and appear on the Huynhs' list of trial exhibits, they do not appear in the record. Our supreme court has provided standards for the submission of non-documentary exhibits. See Ill. S. Ct. Standards and Requirements for Electronic Filing the Record on Appeal, § 3(d)(v) (eff. June, 2017) (addressing the submission of "video or audio recordings, computer media, discs, flash drives, etc."). Again, we resolve any doubt that evidence against the Huynhs. See *supra*, n. 5.

¶ 14    When presented with several records of tenant complaints and repair invoices, Todd testified that Neder Capital sent several repairmen to look at the heating, air conditioning, plumbing, and ceiling, but that no permanent repairs were made. He testified that several service invoices did not correspond to any attempted repairs at all. The repairs that were done on the heater would only "help for like a day or two" before the heat would again become inadequate. The only permanent fix was the installation of a wall-mounted heater, but that was insufficient to warm the whole unit.

¶ 15    Todd testified that in January 2018, he received a report that there was dangerous mold in the unit. Because of the mold report, water damaged ceiling tiles, and the uncomfortably low temperatures inside the social club, Todd decided to vacate the property and move the business.

¶ 16    The next witness was Donna. She admitted that she signed the lease and testified that they vacated the property "right around the end of January, beginning of February [2018]." She also testified that, despite issues with the heating and air conditioning, leaking ceilings, and mold, they continued to operate their business until 2018. She denied ever attempting to exercise her option under the lease.

¶ 17    The next witness was Boris Stratiev. Stratiev testified that he was an employee of Neder Capital, a company owned by a trust for the benefit of his mother and children. He testified that Neder Capital and MRSS had the same principals, and that Neder Capital had eventually absorbed MRSS. On behalf of MRSS and Neder Capital, Stratiev managed the property after MRSS acquired it at foreclosure sale.

¶ 18    Stratiev testified that his first interaction with Todd was in 2016, when the Huynhs had stopped paying rent. At that time, they were able to negotiate payment of back rents. He also testified that strip mall tenants were charged common area management fees, taxes, and utilities,

on a *pro rata* basis. The parties stipulated that Stratiev had a 2000 federal conviction for attempting to engage in monetary transactions affecting interstate commerce in criminally derived property (18 U.S.C. § 1957(a) (1994)).

¶ 19    Laura Palti testified that she is a member and employee of Neder Capital and that she handles its day-to-day operations. She had also been a manager of MRSS before it was dissolved. Palti testified that she sent the bills for rent to the Huynhs from time to time, and that the amount of the monthly rent was determined by the schedule of rents in the written lease. In the months for which the Huynhs actually paid their rent, they paid that amount and did not object to the rent being higher than the original base rent.

¶ 20    Palti testified that she kept the financial books for Neder Capital and that it was she who calculated the Huynhs' outstanding balance. She testified as to Neder Capital's bookkeeping practices, ledgers, and software. She testified in detail about how charges for utilities, taxes, and common building expenses were calculated. She also testified that Neder Capital had engaged the services of a real estate broker to find a new tenant for the property.

¶ 21    Palti admitted that Neder Capital paid management fees to itself and other related companies, and that there were no management contracts in place. She also admitted that, aside from the email from Todd, the Huynhs never gave Neder Capital any other document purporting to exercise their option to extend the lease. And, although Neder Capital prepared a new lease document for the property, it was never executed by either party.

¶ 22    Tony Matthews then testified that he was "a part of the" Huynhs' social club, and that he used the social club as an office. He testified that the roof leaked, ruining ceiling panels and leading to the growth of mold. Matthews testified that, despite multiple assurances, no substantial repairs

were made to the leaking roof. Indeed, he testified, the leaks continued until the Huynhs vacated the property in January 2018.

¶ 23    Matthews testified that, during winter months, the property never reached a comfortable temperature. Repairmen eventually came to the property and installed an additional heating unit, but it was inadequate to heat the entire unit. Matthews testified that the club had to close occasionally because it was simply too cold inside. Matthews also testified that there were often plumbing issues. He testified that he never saw any snowplowing, landscaping, or general janitorial work done at the strip mall.

¶ 24    The Huynhs also called Brett Kelley to testify. Kelley is a licensed home inspector. He testified that he was hired by Matthews to conduct an inspection in the property on December 28, 2018. He identified ceiling tiles that appeared to be broken, water damaged, and moldy. He took an air sample inside of the property. He also took an air sample outside, as a control, and sent both samples to a company called PRO-LAB for analysis. The laboratory report indicated very high levels of "aggressively toxic" stachybotrys mold. He also took a swab of an apparent mold spot, which the laboratory identified as a more innocuous strain of mold.

¶ 25    Kelley also identified several potential safety issues. Among them, Kelley reported: improper installation of the wall-mounted heater; open slots in a circuit breaker box; "a damaged door, a loose toilet, [and] kind of stuff like that". He also used an infrared camera to determine that, although one of the heating registers was over 100 degrees Fahrenheit, the metal fan directly below it was only 70 degrees. Kelley testified that this disparity was consistent throughout the unit, and indicated that, although there was heat in the unit, the blower did not work. Kelley's report was entered into evidence.

¶ 26 On cross-examination, Kelley stated that Matthews, who is a real estate agent, had hired him to perform home inspections in the past. He also admitted that his report form was designed for home inspections rather than commercial building inspections, resulting in some inapplicable language in his final report.

¶ 27 Neder Capital called an expert in rebuttal. Vincent Bendinelli testified that he is a certified mold inspector and mold remediator contractor. He testified that he was surprised when he first saw Kelley's report, because he had never seen a report with such high mold spore counts. Based on Kelley's report, he would have expected to see significant amounts of mold in the property. When he performed his own mold inspection of the property on March 21, 2018, instead of the "mushroom factory" he expected, he found only a couple of water stains and no smells or odors. Bendinelli observed that "it didn't appear there had been much mold at all, if any."

¶ 28 To test for mold, Bendinelli testified that he took two air samples, one in the middle of the main room and one near a utility sink where he would expect conditions more suitable to mold growth. He then sent the samples to PRO-LAB, the same company used by Kelley. Bendinelli testified that the report that he got back from PRO-LAB indicated that there was no stachybotrys mold in the samples. He further testified that he did not take an outdoor control sample because PRO-LAB does not require control samples when the outdoor temperature is especially cold.

¶ 29 On cross-examination, Bendinelli admitted that he has done several inspections for Stratiev and "other Russian clients that are friends of his." He also admitted that he did not prepare a written report of his visual inspection, and that he had never testified in court before. He conceded that he did not have with him any evidence of his certification and that he was not registered with the Illinois Department of Public Health as a mold remediation specialist.

¶ 30     After closing arguments, the circuit court took the case under advisement. On October 24, 2018, the court ruled from the bench. The court found that, by his email to Hunter, Todd had exercised the option to extend the lease. The court also found that Neder Capital's "witnesses were very credible." This includes Bendinelli, whom the court found "far more credible than the [Huynhs'] expert". The court ruled in Neder Capital's favor on all of the Huynhs' defenses and counterclaims and entered a judgment of $13,398.56. The court also and granted Neder Capital leave to file an affidavit of attorney fees and costs.

¶ 31     Neder Capital filed an affidavit of attorney fees, to which the Huynhs filed a written response. The Huynhs also filed a partial motion for reconsideration. After a hearing, the circuit court denied the motion for reconsideration and awarded Neder Capital attorney fees in the amount of $18,666.25.[7] This appeal followed.

¶ 32                                    II. ANALYSIS

¶ 33     The Huynhs list nine issues to be reviewed in their brief. However, the issues can be aggregated  as follows: (1) did the circuit court err in allowing an amended complaint; (2) did the court err in denying the Huynhs' emergency motion to transfer the case; (3) was the circuit court's judgment against the manifest weight of the evidence; and (4) did the court abuse its discretion in awarding attorney fees?

¶ 34                            A. The Huynhs' Briefs

¶ 35     Before we can reach the substance of the Huynhs' arguments, we must address certain flaws in their briefs. Neder Capital correctly points out that the Huynhs' opening brief violates several provisions of Illinois Supreme Court Rule 341 (eff. May 25, 2018). Among other problems,

---

[7] Although the circuit court apparently heard argument on the motion for reconsideration and the issue of attorney fees, no transcript of the proceedings appears in the record.

Neder Capital argues that the Huynhs' opening brief does not properly quote and cite relevant statutes (see *id.* § (h)(5)); does not properly cite to the record in the argument section (see *id.* § (h)(7)); contains an argumentative and incomplete statement of facts (see *id.* § (h)(6)); and does not have proper margins (see *id.* § (a)). We also note that the brief is not double-spaced throughout. See *Id.* And, although not a violation of any specific rule, "Huynh" is constantly misspelled.

¶ 36    Supreme court rules are not mere suggestions; they are rules that must be followed. *In re Marriage of Hluska*, 2011 IL App (1st) 092636, ¶ 57. We have the inherent authority to dismiss an appeal if an appellant's brief fails to comply with supreme court rules. *Epstein v. Galuska*, 362 Ill. App. 3d 36, 42 (2005). However, striking a brief for failure to comply with supreme court rules is a harsh sanction (*In re Detention of Powell*, 217 Ill.2d 123, 132 (2005)) which we decline to impose in this appeal. See *Parkway Bank & Trust Co. v. Korzen*, 2013 IL App (1st) 130380, ¶ 10 (reviewing the merits despite substantial Rule 341 violations).

¶ 37    Neder Capital also moved this court to strike portions of the Huynhs' reply brief. The reply brief includes arguments specifically related to Donna's individual liability, but the opening brief did not develop any such argument. Neder Capital argues that the Huynhs forfeited the right to raise that issue in their reply brief. We took that motion with the case.

¶ 38    Arguments not raised in an opening brief "are forfeited and shall not be raised in the reply brief". Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018). "An issue that is merely listed or included in a vague allegation of error is not 'argued' and will not satisfy the requirements of the rule." *Vancura v. Katris*, 238 Ill. 2d 352, 370 (2010).

¶ 39    We agree that the Huynhs forfeited any arguments about Donna's personal liability by not raising them in their opening brief. Even if such contentions were not forfeited, however, the arguments in the Huynhs' reply brief would not be availing. As discussed below, Donna admittedly

signed the operative lease and the rent admittedly was not paid for several months. The Huynhs' reply brief offers no compelling legal argument for why Donna should not be found liable under these circumstances. It is therefore unnecessary to strike the reply brief. We deny Neder Capital's motion.

¶ 40                                    B. The Amended Complaint

¶ 41    The Huynhs argue that the court erred in allowing Neder Capital to file an amended complaint replacing MRSS as plaintiff. When leave to amend a complaint is requested before the entry of judgment, leave should be liberally granted. *Tomm's Redemption, Inc. v. Hamer*, 2014 IL App (1st) 131005, ¶ 13. This rule is consistent with section 2-616(a) of the Code of Civil Procedure (735 ILCS 5/2-616(a) (West 2016)), which provides that amendment before judgment should be allowed on "just and reasonable terms." When making a determination on a pre-judgment request for leave to amend, trial courts are to consider: (1) whether the amendment would cure the defects in the original pleading; (2) whether the other party would suffer prejudice or surprise as a result of the amendment; (3) the timeliness of the proposed amendment; and (4) whether the requesting party has had other opportunities to amend the pleading. *Loyola Academy v. S&S Room Maintenance*, 146 Ill. 2d 263, 273 (1994). The circuit court has broad discretion in such instances, and we will not reverse absent "a manifest abuse of such discretion." *Id.* at 273-74.

¶ 42    The record does not contain a transcript (or an acceptable substitute) of the status hearing at which the circuit court granted the motion to file an amended complaint. Even so, the record contains ample support for Neder Capital's position that the court did not abuse its discretion in allowing the amendment. As to the first *Loyola* factor, the amendment cured a defect in the original complaint, since the property had been quitclaimed from MRSS to Neder Capital, making Neder Capital the proper plaintiff. As to the three remaining factors, because the motion

was made at the very first status hearing, before the Huynhs filed their appearance, the motion was timely and could not have surprised or prejudiced the Huynhs.

¶ 43    Still, the Huynhs argue that the motion should have been denied because the original complaint created a binding judicial admission that MRSS, not Neder Capital, owned the property and was owed the debt. They rely on *Axion RMS, Ltd. v. Booth*, 2019 IL App (1st) 180724. In *Axion*, this court affirmed the trial court's denial of a motion to amend a verified complaint. In affirming the trial court, we noted that the original complaint was verified. *Id.* ¶ 28. In this case, although the original complaint was labeled "verified", it did not include a verification. See 735 ILCS 5/2-605 (West 2016) (requiring that verified pleadings include the oath of the party filing it). Because there was no verification, there was no binding judicial admission, and *Axion* is inapplicable. The court did not abuse its discretion in allowing Neder Capital to file an amended complaint.

¶ 44                            B. Jury Motions

¶ 45    Generally, a defendant must file a jury demand not later than the filing of his answer. 735 ILCS 5/2-1105(a) (West 2016). However, defendants in eviction actions need not file an answer unless ordered to do so by the court (Ill. S. Ct. R. 181(b)(2) (eff. Jan. 1, 2018)), so section 2-1105(a) is inapplicable to eviction actions. *First Bank of Oak Park v. Carswell*, 111 Ill. App. 3d 71, 73 (1982) (analyzing the predecessor statute to section 2-1105(a) and the then-current version of Rule 182.) "Since no answer need be filed, the procedure to be followed is similar to a small claims court proceeding, in which a defendant is required to file his jury demand by the time he is required to appear." *Id.* (citing Ill. S. Ct. R. 285 (eff. Jan. 1, 1964)).

¶ 46    The Huynhs argue that we should not follow the *Carswell* court in applying the rule for making jury demands in small claims because Neder Capital's complaint sought monetary

damages in excess of $10,000. See Ill. S. Ct. R. 281 (eff. Jan. 1, 2006) (defining small claims as civil actions for not more than $10,000). However, the crucial similarity between eviction and small claims cases is not the amount of the damages, but the fact that the defendants generally need not file an answer. Compare Ill. S. Ct. R. 286(a) (eff. Aug. 1, 1992) ("If the [small claims] defendant appears, he need not file an answer unless ordered to do so by the court; and when no answer is ordered the allegations of the complaint will be considered denied and any defense may be proved as if it were specifically pleaded.") with Ill. S. Ct. R. 181(b)(2) (eff. Jan. 1, 2018) ("If the [eviction] defendant appears, he or she need not file an answer unless ordered by the court; and when no answer is ordered, the allegations of the complaint will be deemed denied, and any defense may be proved as if it were specifically pleaded.") We agree with *Carswell* that a jury demand in an eviction case is late unless it is made on or before the date on which the defendant is ordered to appear.

¶ 47    The Huynhs did not file a jury demand at the time they filed their appearance, on January 2, 2018. Nor did they file a jury demand by January 29, 2018, the date on which the alias summons directed them to appear. Instead, they filed a motion for summary judgment on January 23, 2018, which the court denied after briefing and argument on March 13, 2018. On March 16, 2018, the Huynhs filed their "motion to move case to jury section", followed two days later by their "emergency motion to move case to jury section and to set a new trial date." Under the analytical framework in *Carswell*, the Huynhs' jury demand would have had to be filed by January 29, 2018 at the latest to be considered timely. Instead, they allowed more than two months to elapse between the filing of their appearance and any attempt to demand a jury trial. They were so late, in fact, that the only way to present the motion before the scheduled trial date was to docket it for hearing on an emergency basis.

¶ 48    Having determined that the request for a jury was late, we must decide whether the circuit court abused its discretion in denying the motion. *Hernandez v. Power Construction Co.*, 73 Ill. 2d 90, 95 (1978). "[G]ood cause must be established in order to obtain an extension of time in which to file a late jury demand." *Id.* "The absence of inconvenience or prejudice *** does not alone establish good cause. The moving party must assert some independent ground for granting his late demand." *Id.* at 96.

¶ 49    In their motions, the Huynhs argued that the substitution of Neder Capital for MRSS as plaintiff meant that the Huynhs should be able to demand a jury as to the "new" plaintiff. This ignores the fact that the substitution of Neder Capital for MRSS happened before the Huynhs filed their appearance. The record does not contain a transcript (or other acceptable substitute) of the hearing at which the circuit court denied the motions to transfer the case. In the face of an incomplete record, we must "presume[] that the order entered by the trial court was in conformity with law and had a sufficient factual basis." *Foutch v. O'Bryant*, 99 Ill. 2d 389, 392 (1984).

¶ 50    Moreover, the court's March 23, 2018 order states that the court denied the motions because the court had already heard substantive issues, presumably referring to the denial of the Huynhs' motion for summary judgment. The Huynhs argue that the denial of summary judgment is not a relevant factor in deciding to deny the motion. We disagree. Once the circuit court denied their motion for summary judgment, the circuit court had made a substantive ruling and the Huynhs could no longer have received a substitution of judge as a matter of right. See 735 ILCS 5/2-1001 (West 2016). However, because of the way that the Circuit Court of Cook County is structured, had the court allowed the Huynhs to file a late jury demand, the case would necessarily have been transferred to another judge. The Huynhs clearly recognized this fact, captioning their motions as "motion[s] to transfer case to jury section" rather than "motions to file a jury demand". The circuit

court could certainly have concluded that the Huynhs were attempting to engage in "judge shopping" by using a late jury demand as a tool to eliminate a judge who had already demonstrated she was disinclined to honor their defenses. Obviously, "judge shopping" would not constitute "good cause" for filing a late jury demand.

¶ 51    Given the extreme lateness of the Huynhs' motions, the state of the record, and the plausible implication of "judge shopping", we cannot find that the circuit court abused its discretion in denying leave to file a late jury demand.

¶ 52                                    C. The Trial Evidence

¶ 53    "In close cases, where findings of fact must necessarily be determined from the credibility of the witnesses (such as the case at bar), it is particularly true that an appellate court will defer to the findings of the circuit court unless they are against the manifest weight of the evidence." *Chicago Investment Corp. v. Dolins*, 107 Ill. 2d 120, 124 (1985). This deferential standard is employed "because the trial judge, as a trier of fact, is in a superior position to observe witnesses, judge their credibility, and determine the weight their testimony should receive." *Battaglia v. 736 N. Clark Corp.*, 2015 IL App (1st) 142437, ¶ 23. The Huynhs argue that the court's judgment is erroneous in several ways.

¶ 54    First the Huynhs argue that the court erred in determining that the written lease was still in effect as of the filing of the eviction action. They argue that the foreclosure sale and subsequent transfers of ownership invalidated the lease. Alternatively, they argue that written lease expired by its own terms in 2015. And finally, they argue that the court erred in determining that Todd's email to Megan Hunter was adequate to exercise his option to renew the lease. Particularly, they claim that that the email was too late, was not in the proper form, and was not accepted by Neder Capital.

¶ 55 The Huynhs argue that the foreclosure sale invalidated the lease by its own terms. They claim that certain language in the lease would cause the lease to terminate in the event of a mortgage foreclosure. However, the lease language that they point to in support of this argument does not say anything about the lease terminating. Rather, the language purports to limit the liability of successor owners of the building. The Huynhs do not explain how the contract language supports their position beyond the bald claim that it "indicates clearly that once there is a mortgage foreclosure the lease ends." This underdeveloped argument is insufficient to satisfy the Huynhs' burden on appeal. See *U.S. Bank v. Lindsey*, 397 Ill. App. 3d 437, 459 (2009) ("A reviewing court is entitled to have the issues clearly defined and supported by pertinent authority and cohesive arguments"). Moreover, both an assignment of leases and the quit claim deed from MRSS to Neder Capital are in the record, establishing how the lease came to be assigned to Neder Capital.

¶ 56 The Huynhs next argue that the lease expired in 2015 because the Huynhs never exercised their option to renew it. The lease provided that the "options shall be exercised by Tenant in writing to Landlord not less than one [*sic*] 4 months or 120 days prior to the expiration date of the then current term of this Lease." The Huynhs argue that Todd's email to Hunter was equivocal and not timely. It is undisputed Todd sent the email less than 4 months or 120 days before the expiration date of the original lease term. It is also undisputed that Todd did not receive any response to his email. Therefore, the Huynhs argue, the option was not exercised, and the lease expired at the end of the original term.

¶ 57 The facts of this case are analogous to those in *Oliva v. Amtech Reliable Elevator Co.*, 366 Ill. App. 3d. 148 (2006). In *Oliva*, the plaintiff landlord sought damages for breach of an agreement to extend an office lease. *Id.* at 149. This court held that by remaining in the property beyond the original term of the lease and paying the increased rent laid out in the option to extend the lease, a

17

tenant exercises its option and continues its tenancy as a lessee rather than as a month-to-month holdover tenant. *Id.* at 154.

¶ 58    The evidence shows that, like the defendants *Olivia*, the Huynhs remained in possession of the property after the end of the original lease term and paid increased rent rather than the original base rent. These facts alone are sufficient to affirm the circuit court's conclusion that the Huynhs had exercised their option under the lease, notwithstanding that the court specifically relied on Todd's email to Hunter. See *Rodriguez v. Sheriff's Merit Commission*, 218 Ill. 2d 342, 357 (2006) (this court may sustain a circuit court's judgment for any basis supported by the record, "regardless of whether the circuit court relied on the grounds and regardless of whether the circuit court's reasoning was correct." (Internal quotation marks omitted.)). The circuit court's conclusion that the Huynhs exercised their option under the lease was not against the manifest weight of the evidence.

¶ 59    The Huynhs try to distinguish *Olivia* by pointing out that the lease in that case did not include a written notice requirement. See *Oliva*, 366 Ill. App. 3d. at 156. However, "any requirement that a tenant notify a landlord of the tenant's intention to exercise an option to extend a lease inures to the benefit of the landlord and thus can be waived by the landlord." *Id.* at 153. Because the notice requirement in this case was for the landlord's benefit, Neder Capital could, and evidently did, waive strict compliance. Given Neder Capital's waiver of strict compliance, Todd's email, although admittedly late under the terms of the lease, also formed a sufficient basis for the court to conclude that the Huynhs had exercised their option. And although the Huynhs attempt to cast the language of Todd's email as equivocal, the language "I would like to use my option to renew the lease" was sufficiently definite, unequivocal, and unconditional. But see *Michigan Wacker Associates v. Casdan, Inc.*, 2018 IL App (1st) 17122, ¶¶ 38-40 (holding that

18

tenant's statements that he "would like to discuss," "would like to resolve" or "would propose" were "equivocal at best").

¶ 60    The Huynhs rely on *Casdan* for the proposition that lease options can only be enforced—by either party—if the terms are strictly complied with. This reading is mistaken. In *Casdan*, this court noted that a tenant must strictly comply with option terms unless the landlord waives compliance. *Id.* ¶33. The landlord/tenant relationship is asymmetrical when it comes to renewal options; the tenant has the unilateral ability to exercise the option and the landlord has the unilateral ability to waive compliance with any requirement that inures to his sole benefit. As the tenants, the Huynhs do not get to decide whether the notice requirement is strictly enforced.

¶ 61    Next, the Huynhs argue that the circuit court erred in concluding that they had not been constructively evicted. "Constructive eviction is something of a serious and substantial character done by the landlord with the intention of depriving the tenant of the enjoyment of the premises." *Shaker & Associates, Inc. v. Medical Technologies Group, Ltd.*, 315 Ill. App. 3d 126, 134 (2000). "A tenant is justified in abandoning the premises if the landlord's breach of the covenant to repair makes them unfit for the purpose for which they were leased." *Id.* However, until the tenant quits the premises, he is still obliged to pay rent. *Id.* ("There can be no constructive eviction without the vacating of the premises."). See, also, *McArdle v. Courson*, 82 Ill. App. 3d 123, 126 (1980) ("We are unaware of any authority in this state for permitting a commercial tenant to both remain in possession and refuse to pay rent when a landlord breaches a covenant of the lease, unless the terms of the lease so provide.").

¶ 62    Although the Huynhs presented evidence of various complaints throughout 2016 and 2017, the undisputed evidence shows that the Huynhs did not vacate the premises until over a month after the eviction action was filed, at the end of January or beginning of February 2018. Therefore,

there could have been no constructive eviction before that time. Because the evidence showed that the Huynhs continued to operate the social club and did not vacate the property until January 2018, the court's ruling on the Huynhs' constructive eviction defense was not against the manifest weight of the evidence.

¶ 63    However, even if the circuit court had erred in finding that the Huynhs had not been constructively evicted in January 2018, such constructive eviction is clearly no defense to damages for unpaid rent from 2017. As discussed below, the record includes ample evidence in support of the total judgment amount accruing before Huynhs vacated the property.

¶ 64    The Huynhs next argue that the amount of the judgment is incorrect, because Neder Capital overcharged them. "The determination of damages is a question reserved to the trier of fact, and a reviewing court will not lightly substitute its opinion for the judgment rendered in the trial court." *Richardson v. Chapman*, 175 Ill. 2d 98, 113 (1997).

¶ 65    Palti testified that the Huynhs owed $12,128.93 in back rent as of October 13, 2017. It is undisputed that the Huynhs made no further payments after that date. The ledger on which Palti relied during her testimony, which was admitted into evidence as an exhibit, showed that by November 1, 2017 the alleged arrearage was well in excess of $15,000.

¶ 66    The Huynhs' counsel had the opportunity to cross-examine Palti on her testimony and on the accuracy of Neder Capitals' exhibits. Counsel questioned Palti and Stratiev on how management fees were calculated and argued that Neder Capital overcharged the Huynhs. The circuit court, after hearing all the testimony, found Palti to be an "extremely credible" witness and entered a judgment of $13,398.56, an amount significantly lower than the amount requested by Neder Capital in its closing argument, but substantially in line with Palti's testimony. The Huynhs' own brief unironically refers to the judgment amount as "*de minimums* [*sic*] or nominal."

20

¶ 67    Because the judgment amount is neither unreasonable, arbitrary, nor completely unsupported by the evidence, we will not disturb it. See *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 106 (1995) ("A judgment is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the findings *** are unreasonable, arbitrary, and not based upon any of the evidence.")

¶ 68    Finally, the Huynhs argue that the court erred in awarding attorney fees. The circuit court has broad discretion when awarding attorney fees and its decision will not be reversed absent an abuse of discretion. *In re Estate of Callahan*, 144 Ill. 2d 32, 43-44 (1991); *Richardson v. Haddon*, 375 Ill. App. 3d 312, 314 (2007).

¶ 69    The lease provides, in relevant part: "If Landlord shall bring any action for any relief against the Tenant *** Tenant shall pay Landlord a reasonable sum for attorneys' fees and other costs of suit ***." The Huynhs' primary argument mirrors their earlier arguments that the written lease was no longer in effect at the time this suit was filed. For the reasons discussed above, we affirm the circuit court's conclusion that the Huynhs had exercised their option, and that the lease—together with its attorney fee provision—remained in effect.

¶ 70    The Huynhs' next argument about attorney fees is that Neder Capital did not properly request attorney fees in its pleadings. In particular, they claim that Neder Capital's failure to attach the lease to the amended complaint was fatal to its claim for attorney fees. "If a claim or defense is founded upon a written instrument, a copy thereof ***must be attached to the pleading as an exhibit ***." 735 ILCS 5/2-606 (West 2016). "When the issue of the failure to attach such written instrument has not been raised at trial, however, it cannot be raised on appeal." *Exchange National Bank of Chicago v. Sampson*, 186 Ill. App. 3d 969, 975 (1989) (affirming award of attorney fees in a commercial eviction case).

¶ 71    In its amended complaint Neder Capital included a request for attorney fees and costs. And although the lease was not attached as an exhibit to the complaint, the Huynhs did not attack the amended complaint on that basis. In fact, the Huynhs themselves put the lease into the record, attaching it to their motion for summary judgment. The Huynhs have forfeited any argument based on the failure to attach the lease to the amended complaint.

¶ 72    The Huynhs' final argument is that the amount of the attorney fee award is unreasonable. In determining the amount of attorney fees to award, a court should consider "the skill and standing of the attorneys, the nature of the case, the novelty and/or difficulty of the issues and work involved, the importance of the matter, the degree of responsibility required, the usual and customary charges for comparable services, the benefit to the client [citation], and whether there is a reasonable connection between the fees and the amount involved in the litigation [citations]." *Kaiser v. MEPC American Properties, Inc.*, 164 Ill. App. 3d 978, 984 (1987).

¶ 73    No record of proceedings (or acceptable substitute) from the fee hearing is in the record, so we presume that court conformed the attorney fee award with the law and relied on a sufficient factual basis. See *Foutch*, 99 Ill. 2d, 392. Even so, Neder Capital's affidavit of attorney fees specifically addresses the factors outlined in *Kaiser* and includes invoices that carefully detail the legal work done over the course if this protracted case. Given this record and our deferential standard of review, we cannot find that the circuit court abused its discretion in fashioning the award of attorney fees.

¶ 74                                    III. CONCLUSION

¶ 75    For the reasons explained above, we affirm the judgment of the circuit court in all respects.

¶ 76    Affirmed.