NOTICE
Decision filed 04/01/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 250920-U

NOS. 5-25-0920 and 5-25-0921, cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | |
|---|---|
| *In re* SKYLOR L. Jr. and SKYLYNN L., Minors )<br><br>(The People of the State of Illinois, )<br><br>    Petitioner-Appellee, )<br><br>v. )<br><br>Skylor L., )<br><br>    Respondent-Appellant, )<br><br>and )<br><br>Pokagon Band of Potawatomi Nation Indians, )<br><br>    Intervenor-Appellee). ) | Appeal from the<br>Circuit Court of<br>Jasper County.<br><br><br><br><br>Nos. 24-JA-1, 24-JA-2<br><br><br><br><br><br><br>Honorable<br>Chad M. Miller,<br>Judge, presiding. |

_____

    JUSTICE SHOLAR delivered the judgment of the court.
    Presiding Justice Cates and Justice Bollinger concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The circuit court's judgment terminating the respondent's parental rights was not against the manifest weight of the evidence where the State met its burden of proving that the respondent was unfit to parent and that termination was in the best interest of the minors. Therefore, the judgment of the circuit court is affirmed.

¶ 2    The respondent, Skylor L. (Father), appeals from the October 9, 2025, order of the Jasper County circuit court terminating his parental rights over his two minor children. On appeal, Father

1

challenges both the finding of unfitness and the determination that it was in the minors' best interests to terminate his parental rights. For the reasons explained below, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4     This case began on January 16, 2024, when the State filed petitions for adjudication of wardship regarding Skylor L. Jr.[1] and Skylynn L.[2] The petitions alleged that the children, then aged five and four, respectively, were neglected by reason of an environment injurious to their welfare. 705 ILCS 405/2-3(1)(b) (West 2022). Specifically, the State alleged that the minors' mother (Mother)[3] admitted to using methamphetamine in her home while the children were present, that Mother left the children unsupervised or without proper supervision, and that Father was currently incarcerated in the Illinois Department of Corrections (IDOC) and unable to care for the children. The circuit court held a shelter care hearing on January 17, 2024, at which Mother stipulated to the State's allegations. The circuit court entered a temporary custody order the same day, naming the Illinois Department of Children and Family Services (DCFS) as the minors' temporary guardian.

¶ 5                 A. Adjudication of Neglect and Initial Proceedings

¶ 6     DCFS filed with the circuit court an initial service plan established on January 14, 2024. Father's only service requirement was to cooperate with DCFS and Lutheran Child and Family Services (LCFS). This included participating in an integrated assessment and maintaining regular contact with his caseworker. On March 7, 2024, following a hearing, the circuit court entered an

---

[1]As this minor and Father share the same name, for clarity, we note that all references to "Skylor" going forward refer to the minor.

[2]This appeal arises from both minors' cases, Jasper County circuit court case Nos. 24-JA-1 and 24-JA-2. For clarity, we discuss the cases and the filings in each respective case as one.

[3]Mother's parental rights were also terminated. However, she is not a party to this appeal, and we refer to her only where relevant.

order finding that the Indian Child Welfare Act (ICWA) applied,[4] that active efforts had been made to prevent the breakup of the Indian family, and that those efforts were unsuccessful.

¶ 7   On April 18, 2024, the circuit court held an adjudicatory hearing, after which it entered an order finding the minors to be neglected due to an injurious environment pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act). 705 ILCS 405/2-3(1)(b) (West 2022). On July 16, 2024, following a hearing, the circuit court entered an agreed dispositional order finding the parents unable to care for the minors and making the minors wards of the court. The permanency goal was return home within 12 months. Father was paroled on July 17, 2024.

¶ 8   DCFS and LCFS respectively filed a January 10, 2025, service plan and a permanency report on January 30, 2025. The two filings indicated that Father completed an integrated assessment in February 2024 and had initially maintained communication with his caseworker after his release from IDOC. However, on January 14, 2025, Father ceased communication and stated that he would only speak with his caseworker if he had a lawyer present. Father also completed a mental health assessment in October 2024 and was recommended six monthly therapy sessions. Thus far, he had cancelled and rescheduled the first appointment.

¶ 9   Father was also placed on a waitlist for a substance abuse assessment and was referred for drug testing. Three testing dates were scheduled, one in October 2024 and two in January 2025. Father failed to appear at all three. He initially had difficulty with transportation because he did not have a car. For the second date, he was given a gas card, but told the caseworker that he would not talk to her. On the third date, a caseworker arrived at his home to transport him to the test; Father was not home when she arrived. Father was also recommended to participate in a sobriety support group. On December 10, 2024, he told LCFS that he would not attend his local support

---

[4]This was through Mother, who was a member of the Pokagon Band of the Potawatomi Tribe.

group, as Mother also attended the group, and he did not want to see her. As of the report, LCFS did not have information regarding whether Father had maintained his sobriety.

¶ 10    The home where Father was allegedly residing and paroled passed a safety inspection. However, it was believed that Father was not actually living there. LCFS was contacted by an individual from Father's sobriety program, who said that Father had called them asking for assistance in finding housing on January 23, 2025. He was apparently staying at a hotel, but could no longer afford it. At the time of the LCFS report, his location was unknown. Father was also recommended to undergo a parenting evaluation and was currently engaged in a parenting course.

¶ 11    Lastly, Father initially received two hours of supervised visitation per week in the community. He was told to bring healthier snacks for the minors, which upset him. During visits, he showed love for his daughter and antagonized his son. When his son would get upset about this treatment, Father would belittle and insult him. He had no patience for his son. During one visit, the son arrived with a scratch on his arm; Father then tried to make the minor say that his foster parent caused the injury.

¶ 12    At another visit, Father claimed that his daughter had a swollen nose and a bruised eye. When the case aide supervising the visit told him that she did not see any injuries on the minor, Father became verbally aggressive, and needed to be told four times to calm down. After that visit, Father called the DCFS hotline to report that the minors' foster parent was abusing them. There was no proof that his allegation was true, and a doctor confirmed that the children did not bear any signs of abuse. After this incident, Father's visitation was decreased to one hour per week, at the DCFS offices. One such visit was scheduled to take place prior to the date of the permanency report. Father did not appear.

4

¶ 13    LCFS filed another permanency report on March 4, 2025. This report stated that Father had contacted the Federal Bureau of Investigation (FBI) to report that the foster parent was abusing his children, despite being told several times that this was not true. He also reported to the FBI that Skylynn's bed was in the foster parent's bedroom, which the LCFS report noted was something Father would only know if he were looking into the windows of the foster home.

¶ 14    Regarding cooperation with DCFS/LCFS, Father maintained his intentions not to speak with caseworkers since mid-January of 2025. When his caseworker reached out, Father seldom responded. As for mental health, Father's caseworker had not received any updates on Father's engagement in therapy since Father's cancellation and rescheduling of his first appointment. Father had been referred to substance abuse counseling. He claimed he lacked transportation despite LCFS's assistance. Father was also supposed to attend a sobriety support group, but as of the report, LCFS did not know whether he was maintaining his sobriety. There was also no update on Father's housing status. He did, however, complete his parenting program. Lastly, he had not shown up to any visits with the minors since his visitation schedule was reduced to one hour per week.

¶ 15    The circuit court entered a permanency order on March 18, 2025. The court found that Father had not made substantial progress towards the return home of the minors. The permanency goal remained return home within 12 months.

¶ 16    LCFS filed another report on May 28, 2025. Father's communication with caseworkers remained poor. Regarding mental health, Father had been attending counseling, was opening up to the counselor, and was using anger management skills. He was scheduled to complete his six-month counseling requirement in April 2025. However, on April 15, 2025, the counselor informed LCFS that Father had not appeared since March 10, 2025. Father was sent a re-engagement letter,

5

but did not respond. His client file for mental health counseling was therefore closed without his completion of the service requirement. While Father was informed of the need to re-engage with services, he had not done so by the time of the report.

¶ 17    Father completed a substance abuse assessment in March 2025 which resulted in no further recommendations. The status of Father's sobriety remained unknown, and he had not engaged in a sobriety support group. Father also had not completed any drug screens, despite LCFS assistance in the form of a gas card, scheduling tests to coincide with his visitation, and arranging for a caseworker to pick him up and transport him. Between October 2024 and early May 2025 he was scheduled for testing 11 times. Three of those tests could not occur because no one was available at the time to collect his sample. However, the remaining eight were not completed due to Father's failure to appear or his refusal. The report explained that any failure to appear or refusal to submit to testing counted as a failed drug test.

¶ 18    Father's housing status remained unknown. Father had completed his parenting course, but due to his failed drug screens, Father was required to re-engage in parenting services once he obtained and maintained sobriety. Lastly, Father's attendance at visitation was "extremely sporadic," and his visitation was therefore reduced to one hour every other week. Father had also filed an appeal with DCFS after his unsuccessful report alleging that the foster parent was abusing his children.

¶ 19    On June 17, 2025, the State filed a petition for termination of parental rights in each minor's case. The State alleged that Father was an unfit parent on the bases of (1) failure to maintain a reasonable degree of interest, concern, or responsibility as to the minors' welfare (750 ILCS 50/1(D)(b) (West 2024)); (2) failure to make reasonable efforts to correct the conditions that led to the removal of the minors during the nine-month period following April 18, 2024 (*id.*

6

§ 1(D)(m)(i)); (3) failure to make reasonable progress toward the return of the minors within nine months after the adjudication of neglect (*id.* § 1(D)(m)(ii)); and (4) depravity, as Father had been convicted of at least three felonies and at least one occurred in the last five years (*id.* § 1(D)(i)).

¶ 20 On June 25, 2025, LCFS filed another permanency report, which indicated that nothing had changed for Father across all of his required services. It also noted that Father's appeal with DCFS was dismissed. On July 15, 2025, the circuit court changed the permanency goal to substitute care pending court determination on termination of parental rights. On August 1, 2025, DCFS filed a service plan dated July 17, 2025. It reflected no changes from the previous reports filed with the court. It also indicated that Father had not provided any proof of housing or income.

¶ 21 B. Fitness Hearing

¶ 22 On August 27, 2025, LCFS filed a report in advance of the fitness hearing. Father's communication had not improved, and LCFS had no indication that he had re-engaged in mental health counseling. He had been scheduled for seven more drug tests since the last report, two of which did not occur due to a lack of staff availability. As for the remaining five, between July 9, 2025, and August 27, 2025, Father failed to appear. Father's housing status remained unknown, and he was still required to re-engage in parenting services after obtaining and maintaining sobriety. His visitation schedule remained at one hour every other week at the DCFS offices. DCFS and LCFS recommended that the goal for the minors would be adoption.

¶ 23 The circuit court held a fitness hearing on September 23, 2025. Michelle Barco testified for the State as an expert witness for the purposes of the ICWA, explaining that she was a member of the Pokagon Band Family Welfare Commission and was familiar with her tribe's child-rearing practices. She stated that while she did not know Mother and Father personally, she reviewed the petition, reports, and integrated assessments filed with the circuit court, and had received monthly

7

updates on the minors' cases from social services. She opined that both parents' actions in caring for their children had not been consistent with Pokagon Band child-rearing practices, that the parents had failed to maintain responsibility for their children's welfare, and their continued custody of the children would likely result in emotional and physical harm to the children. Barco further testified that she believed the children's current foster placement, with their maternal grandmother, was consistent with tribal child-rearing practices.

¶ 24    LCFS child welfare specialist Kaitlyn Allen also testified for the State. She explained that she had been involved in the minors' case since January 2024 and was the initial caseworker assigned to the case. Allen testified that Father's service plan recommendations included services for substance abuse, mental health, housing, and parenting. She stated that Father's communication with her post-January 2025 was poor.

¶ 25    Allen testified that Father completed a substance abuse assessment in or around January 2025 and no recommendations were made, despite Father's prior conviction for manufacturing methamphetamine. However, because he did not attend any of his drug tests, he was told to complete another assessment, which he did not do. Allen also explained the assistance that LCFS had attempted to provide Father to get him to the drug testing location, including coming to his home to pick him up in January 2025 when he still had a known address. When Allen and a case aide arrived, he was not home, and his girlfriend told them that he said he would not attend testing because he did not wish to speak with Allen without his lawyer present.

¶ 26    Allen further stated that Father was engaged in mental health counseling from December 2024 to March 2025 after which he stopped attending. He was unsuccessfully discharged in April 2025. In September 2025 Allen was notified by the provider that Father was engaging in counseling, but the provider did not specify if it was for mental health or substance abuse, and did

not indicate that he completed the requisite number of sessions for either. His current rating on mental health services remained unsatisfactory. Father also had not provided LCFS with an address at which he resided. He did, however, successfully complete parenting as of January 2025.

¶ 27 Regarding visitation, Allen testified that Father tended to focus most of his attention on Skylynn over Skylor. Allen spoke of a January 2025 visit during which Father became aggressive, and, because of his behavior, his visits were reduced and moved from the community to the DCFS offices for safety reasons. Father's attendance was sporadic from January 2025 through April 2025 but he began attending visitation more frequently in May 2025. At the conclusion of Allen's testimony, the State rested.

¶ 28 Linda Blake testified on behalf of Father. She stated that she was employed by Family Life Center (FLC) as an instructor of parenting classes. She stated that she knew Father as an FLC client, explaining that he voluntarily attended weekly parenting classes beginning in September 2024. She stated that he completed 23 sessions in total and was required to complete a minimum of 18. She described his attitude during class as willing and eager, and said that he always came on time, if not early. Blake testified that Father said on several occasions that he would do anything to get his children back.

¶ 29 On cross-examination, she stated that she never observed Father with his children. She also testified that she knew Father to be employed while he was attending parenting classes, working for "a man that did painting and drywalling." She explained that he attended classes from approximately September 2024 to early February 2025. After Blake's testimony, Mother testified on her own behalf.

¶ 30 After the close of testimony, the State argued that while Father completed his parenting requirement, he failed to complete any other services. And regarding substance abuse, he failed to

submit to even a single drug test. The guardian *ad litem* (GAL) stated that he agreed with the State and believed it had met its burden of showing that Father was unfit to parent. He noted that Father was originally only alleged to be unfit because of his criminal convictions and incarceration, and had he completed his service plan upon his release, he would not be facing termination of his parental rights. The GAL argued that this contradicted Father's alleged desire to "do anything to get his kids back."

¶ 31 Counsel for Father argued that the evidence showed that he participated in services after his release from IDOC, and even completed his parenting requirement. Counsel highlighted Blake's testimony about how committed Father was to getting his children back and how devoted he was, even attending more classes than DCFS required of him. Counsel noted that Father was not recommended for substance abuse counseling after being evaluated. He also re-engaged in mental health counseling after being unsatisfactorily discharged.

¶ 32 After hearing arguments, the circuit court first found that the State had satisfied its requirements under the ICWA. Turning to the State's petition, the circuit court found that the State had not met its burden of proving Father's failure to maintain a reasonable degree of interest, concern, or responsibility as to the minors' welfare.

¶ 33 Regarding reasonable efforts, the circuit court identified the relevant nine-month period alleged in the State's petition as being the one immediately following the adjudication of neglect, which the court stated was from April 18, 2024, to late January 2025.[5] The circuit court noted that while Father was not recommended substance abuse counseling, he was required to undergo drug testing based on the history of the case and the specific circumstances present. Because he did not

---

[5]The circuit court did not specify a precise nine-month period in its oral or written rulings. The nine-month period beginning on April 18, 2024, would end on January 18, 2025.

do so, and could not show that he could pass a drug test, there was not full compliance. Regarding mental health, while Father initially complied at the beginning of the relevant period, and he may have re-engaged in services later, he did not complete mental health services. There was also no testimony regarding where Father was currently living. He did, however, complete parenting classes, and the circuit court even acknowledged that he was a "star student."

¶ 34    The circuit court concluded that while there had been some efforts, Father did not make reasonable efforts toward the return of the minors during the nine-month period following the adjudication of neglect. The circuit court also found that Father did not make reasonable progress, particularly on substance abuse and housing.

¶ 35    Lastly, the circuit court considered the State's depravity presumption argument. The court noted that Father's criminal record included three felony convictions, with at least one of those convictions occurring within five years of the State's petition. The circuit court found that Father had not shown by clear and convincing evidence that he had overcome the presumption of depravity. The circuit court thus concluded that Father was unfit to parent the minors and set the matter for a best-interest hearing.

¶ 36                        C. Best-Interest Hearing

¶ 37    LCFS filed a best-interest report on September 26, 2025, in advance of the hearing. It stated that both minors were currently placed with their maternal grandparents, with whom they had been living since May 29, 2025. Both minors were bonded with their caregivers. The minors sought them out for comfort, guidance, and support, and enjoyed spending time with their maternal siblings, who were also in the grandparents' care. The grandparents were committed to adopting both minors.

11

¶ 38 The report also stated that, prior to entering care, seven-year-old Skylor had not seen a doctor since early 2022, and had eight cavities. He appeared unkempt, with dark circles under his eyes, pronounced cheekbones, and a dull, lifeless gaze. He had not been enrolled in school by age five, and exhibited behavioral concerns when he came into care. He also frequently relied on his sister. After being in the care of his maternal grandparents, Skylor had been to multiple doctors' appointments and mental health counseling. He had successfully completed kindergarten and started first grade. He had friends and interests, and developed socialization and hygiene skills. He also became more independent, his appearance improved, and he exhibited a "sparkle and animation" that he lacked upon entering care.

¶ 39 Five-year-old Skylynn had not seen a doctor since early 2021, prior to coming into care, and had not had a dental exam. She had unkempt hair, dark circles under her eyes, and appeared sad all the time. She did not socialize with others and had taken on a caretaker role for her older brother. She also exhibited signs of food insecurity. Since coming into care, she stopped acting like her brother's caretaker, had started kindergarten, was receiving speech therapy, had developed socialization skills, and had improved her hygiene. She was looking healthier and gained "sparkle and animation." She had also had medical, vision, and dental exams. The LCFS report concluded that the probability of the minors' reunification with their parents was low.

¶ 40 The best-interest hearing took place on October 9, 2025. The circuit court took judicial notice of the testimony from the fitness hearing and the September 2025 LCFS report. LCFS caseworker Kaitlyn Allen testified that she prepared this report and that it was DCFS/LCFS's position that Father's parental rights be terminated.

¶ 41 Allen spoke to the contents of her report, explaining that the minors had been placed with their maternal grandmother in May 2025 and were enrolled in school. She testified that the minors

said they felt safe and secure in the foster placement and enjoyed living with their grandparents and their other maternal siblings. The minors took part in activities and trips with the family, and regularly attended church. Allen described the minors as well-nurtured, well-nourished, and well-groomed.

¶ 42    She also described the marked improvement in both minors' personalities, appearances, social skills, and hygiene that she had observed during their time in this foster placement, compared to when they first entered care. They had developed their own respective senses of identity around the foster family, showed each other affection, and were bonded with their foster parents, seeking them out for comfort and guidance.

¶ 43    On cross-examination, Allen stated that the foster family's income came from the minors' grandfather's job at a school. Allen acknowledged that she had not made inquiries as to how the foster parents could financially support adopting both minors, particularly when they already had two other children in their care. She also did not know the family's income level. Lastly, Allen testified that the minors both had bonds with Father and Mother as well as with their foster parents.

¶ 44    Allen also testified that the grandparents wished to adopt the minors if their parents' rights to them were terminated. While she had not spoken with the minors about whether they wished to be adopted by their grandparents, Allen opined that they appeared to like living with them. Furthermore, the minors and their maternal grandmother shared Native American ancestry, and the adoption would allow the minors to be raised in their culture.

¶ 45    During arguments, Father's counsel referenced Linda Blake's testimony from the fitness hearing, stating that her testimony showed how passionate Father was about his children. Counsel argued that Father had a bond with the minors and cared deeply about them. Furthermore, placing

the minors with their maternal grandparents would take them away from Father's family entirely and impact the minors' bond with Father.

¶ 46    In delivering its ruling, the circuit court began by noting that it had previously declined to find that Father was unfit due to a lack of interest in his children. However, based on the reports, the testimony, and the entire record, the circuit court found that the State had met its burdens of showing both "active efforts *** to prevent the breakup of the Indian family" (25 U.S.C. § 1912(d) (West 2024)) and that termination of Father's and Mother's parental rights was in the best interests of the minors.

¶ 47    The circuit court entered a written order terminating Father's parental rights on October 9, 2025. Father filed a timely notice of appeal.

¶ 48                              II. ANALYSIS

¶ 49    On appeal, Father does not challenge the circuit court's determinations pursuant to the ICWA. He argues that the circuit court's findings that he was an unfit parent and that termination of his parental rights was in the best interests of the minors were against the manifest weight of the evidence. We disagree.

¶ 50                  A. The Circuit Court's Finding of Unfitness

¶ 51    A parent's right to raise his or her child is a fundamental right, which a court may not terminate without the parent's consent except as authorized by statute. *In re Gwynne P.*, 215 Ill. 2d 340, 354 (2005). A court's statutory authority to involuntarily terminate parental rights is governed by the Juvenile Court Act and the Adoption Act. *Id.* Pursuant to the Juvenile Court Act, the involuntary termination of parental rights requires a two-step process. *In re Donald A.G.*, 221 Ill. 2d 234, 244 (2006). First, the court must determine, by clear and convincing evidence, that the parent is an "unfit person" as defined by section 1(D) of the Adoption Act (750 ILCS 50/1(D)

14

(West 2024)). See *In re Donald A.G.*, 221 Ill. 2d at 244; 705 ILCS 405/2-29(2) (West 2024). If the court makes a finding of unfitness, it next considers whether termination of the parent's rights is in the best interests of the child. *In re Donald A.G.*, 221 Ill. 2d at 244; 705 ILCS 405/2-29(2) (West 2024).

¶ 52    Here, the circuit court based its unfit-person ruling on a lack of reasonable efforts or reasonable progress, and on depravity. As applicable to the underlying case, the Adoption Act defines an "unfit person" as:

> "D. 'Unfit person' means any person whom the court shall find to be unfit to have a child, without regard to the likelihood that the child will be placed for adoption. The grounds of unfitness are any one or more of the following ***:
>                                    * * *
> (i) There is a rebuttable presumption that a parent is depraved if the parent has been criminally convicted of at least 3 felonies under the laws of this State or any other state, or under federal law, or the criminal laws of any United States territory; and at least one of these convictions took place within 5 years of the filing of the petition or motion seeking termination of parental rights.
>                                    * * *
> (m) Failure by a parent (i) to make reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent during any 9-month period following the adjudication of neglected or abused minor ***, or (ii) to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected or abused minor ***." 750 ILCS 50/1(D)(i), (D)(m)(i)-(ii) (West 2024).

¶ 53    Under the Adoption Act, "reasonable effort" is "a subjective standard and refers to the amount of effort reasonable for the particular parent." *In re P.S.*, 2021 IL App (5th) 210027, ¶ 34. The court must determine "whether the parent has made earnest and conscientious strides toward correcting the conditions that led to the removal of the minor from the home." *Id.*

¶ 54    By contrast, "reasonable progress" is determined by an objective standard, based upon the amount of progress measured from the conditions existing at the time custody was revoked. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 47. The Adoption Act provides guidance for measuring reasonable progress as follows:

15

"If a service plan has been established *** to correct the conditions that were the basis for the removal of the child from the parent and if those services were available, then, for purposes of this Act, 'failure to make reasonable progress toward the return of the child to the parent' includes the parent's failure to substantially fulfill his or her obligations under the service plan ***." 750 ILCS 50/1(D)(m)(ii) (West 2024).

The benchmark for measuring reasonable progress encompasses "compliance with the service plans and court's directives in light of the condition that gave rise to the removal of the child and other conditions which later become known that would prevent the court from returning custody of the child to the parent." *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17 (citing *In re C.N.*, 196 Ill. 2d 181, 208 (2001)).

¶ 55    In Illinois, "depravity" means "an inherent deficiency of moral sense and rectitude." *In re L.J.S.*, 2018 IL App (3d) 180218, ¶ 18 (quoting *In re A.M.*, 358 Ill. App. 3d 247, 253 (2005)). The State shows depravity "by establishing that respondent has a 'deficiency' in moral sense and either an inability or an unwillingness to conform to accepted morality." *Id.* The statutory ground of depravity "requires the trier of fact to closely scrutinize the character and credibility of the parent," and we afford deferential treatment to the circuit court's determination, as the trier of fact. *In re J.A.*, 316 Ill. App. 3d 553, 563 (2000).

¶ 56    Section 1(D)(i) of the Adoption Act (750 ILCS 50/1(D)(i) (West 2024)) provides that there is a rebuttable presumption that a parent is unfit by reason of depravity if the parent "has been criminally convicted of at least 3 felonies *** and at least one of these convictions took place within 5 years of the filing of the petition or motion seeking termination of parental rights." *Id*. A rebuttable presumption creates " 'a *prima facie* case as to the particular issue in question and thus has the practical effect of requiring the party against whom it operates to come forward with evidence to meet the presumption.' " *In re J.A.*, 316 Ill. App. 3d at 562 (quoting *Diederich v. Walters*, 65 Ill. 2d 95, 100 (1976)). However, once evidence opposing the presumption is

16

presented, that presumption ceases to exist. *Id.* The burden of proof "does not shift but remains with the party who initially had the benefit of the presumption." *Id.* at 562-63.

¶ 57    Each case concerning parental fitness "is *sui generis*, unique unto itself." *In re N.G.*, 2018 IL 121939, ¶ 29. Additionally, we may affirm the circuit court's unfitness finding "if supported by any one of the statutory grounds set forth in section 1(D) of the Adoption Act." *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006). In reviewing a court's findings that a parent is unfit and that terminating parental rights is in the best interest of the child, we do not retry the case; rather, we must determine if the findings are against the manifest weight of the evidence. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31. The lower court's finding of unfitness is afforded great deference because that court was best positioned to view and evaluate the parties and their testimony. *Id.* Accordingly, on appeal, we will not reweigh the evidence or reassess the credibility of the witnesses. *Id.* A decision is contrary to the manifest weight of the evidence "if the opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on the evidence presented." *Id.*

¶ 58    On appeal, Father argues that the circuit court's finding of lack of reasonable efforts during the time from April 18, 2024, through January 2025 was against the manifest weight of the evidence because Father (1) completed his integrated assessment at the beginning of the case, (2) completed his mental health assessment in October 2024, (3) completed his substance abuse assessment in January 2025, (4) engaged in mental health counseling in December 2024 and January 2025, (5) was consistent in visitation until January 2025, and (6) was dedicated to completing parenting services starting in September 2024. Father also cites to the testimony of Linda Blake, who said that Father voluntarily started parenting classes, attended every week and appeared eager and willing to do so, did a total of 23 sessions when only 18 were required, arrived

17

early unless he had a scheduling overlap with counseling, and routinely said that he would do whatever it took to get his children back.

¶ 59    Father admits that there were "a few services" that he "could have improved on," including attendance at drug testing, but he contends that there was sufficient evidence of reasonable effort. He adds that he was incarcerated during the relevant nine-month period until July 2024 and upon his release, he eagerly began to engage in services. Furthermore, he points out that the children were removed due to Mother's actions, and Father completely corrected the conditions that prevented him from having custody of the minors.

¶ 60    While we recognize that the minors were removed due in large part to Mother's drug use, and that Father was incarcerated at the time, the adjudication of neglect was also based on the minors being left unsupervised, both because of Mother's actions and because Father was incarcerated and could not care for them during that time. Furthermore, Father downplays the importance of completing substance abuse services, as drug use was still one of the conditions that needed to be improved before the minors could be returned to him. It is true that he completed a substance abuse assessment that resulted in no further recommendations. However, he could not prove his sobriety at any point in the case, including the relevant nine-month period. Father never attended a sobriety support group, which was specifically required under his service plan. He also never submitted to drug testing, and DCFS/LCFS counts every missed test as a failure. He therefore failed every single drug test for which he was scheduled, apart from the few that could not be completed due to staffing issues.

¶ 61    Furthermore, caseworker testimony showed that Father was intentionally refusing to be tested, as he was offered transportation assistance and even pick-up at his last known address. However, he chose not to be home that day, and his girlfriend informed the caseworker that Father

18

refused to speak with the caseworker.[6] This also demonstrated Father's lack of effort to communicate and cooperate with his caseworker towards the end of the relevant nine-month period. He refused to communicate with her without his attorney present. We determine that it was not against the manifest weight of the evidence for the circuit court to find that Father failed to make reasonable efforts to correct the condition of substance abuse in the home.

¶ 62    Relatedly, the circuit court's finding of neglect was based on an injurious environment, and by the end of the relevant nine-month period, Father could not show that he had a permanent residence in which he could raise the minors. While it is unclear from the record when Father was no longer living at the address, he was seemingly living in a hotel by late January 2025 and was no longer living at the address to which he was paroled following his release from IDOC. If, during the nine-month period, Father went from having a residence to seemingly being homeless—or at least choosing not to inform DCFS/LCFS of his address—he regressed on correcting the injurious environment to which the minors would be returned were Father to regain custody. Therefore, this was also an evidentiary basis for the circuit court's finding of lack of reasonable efforts.

¶ 63    Regarding visitation, we note that Father's decreased visitation hours, his drop in attendance, and his accusations regarding the foster parents and DCFS, including his reports to DCFS and the FBI, largely began in late January 2025 just after the relevant nine-month period. However, before then, Father was still observed to be antagonizing his son during visits and treating the children unequally. Father was also told during this time to bring healthier snacks for the minors, and he reacted by becoming upset. Additionally, Father began noting supposed injuries

---

[6]This took place on January 22, 2025, a few days past the relevant nine-month period. However, we reference it as evidence presented to the circuit court of Father's pattern of refusal to cooperate with DCFS/LCFS and willful failure to complete substance abuse services.

on the minors during this time, and was observed trying to convince his son to blame a scratch on his arm on his foster parents during a January 14, 2025, visit.

¶ 64 Despite the testimony presented about Father's eagerness to learn and participate in parenting classes, his behavior when he was actually observed parenting his children suggests that he was not making efforts to apply the skills he was being taught. Furthermore, we defer to the circuit court's weighing of competing evidence and its determinations of witness credibility on the point of Father's alleged eagerness to do whatever it took to get his children back. See *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31.

¶ 65 Next, while we acknowledge that Father could not complete his various assessments and services until he was released from IDOC custody in July 2024 he did not begin to work on his service plan for months after his release. He admits that he did not complete a mental health assessment until October 2024 or a substance abuse assessment until January 2025. Regarding the latter, Father cannot rely on the lack of recommendations following the assessment to excuse his lengthy delay in complying with his service plan requirements.

¶ 66 Looking at Father's efforts subjectively, it is clear from the record on appeal that his efforts to correct the conditions that brought the minors into care fell short of reasonable. This is particularly apparent regarding his substance abuse service requirement. Based on all of the above, we conclude that the circuit court's finding of lack of reasonable efforts was not against the manifest weight of the evidence. While we may end our review here, having found at least one statutory ground upon which to affirm the circuit court's unfitness finding, we will nevertheless discuss the remaining two as well. See *In re Daphnie E.*, 368 Ill. App. 3d at 1064.

¶ 67 Turning to subsection 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2024)), Father argues that while he did not complete all of his services within the first nine months

following the adjudication of neglect, his progress was reasonable. He contends that the circuit court erred in finding him unfit based on a lack of reasonable progress for the same reasons he raised regarding reasonable efforts. Father further argues that the circuit court only determined that he failed to make reasonable progress because it had also found that he failed to make reasonable efforts, and the court thus did not conduct a separate reasonable-progress analysis.

¶ 68    While Father is correct that the analysis of reasonable efforts and reasonable progress is not one and the same, the same evidence is relevant to both findings. However, we apply an objective standard to determine whether Father failed to substantially fulfill his service plan obligations. *Id*. Viewing Father's objective progress, measured against his service plan and the conditions that led to the minors' removal, it is clear that the circuit court's finding was not unreasonable, arbitrary, or not based on the evidence.

¶ 69    As we have stated, the minors were deemed to be neglected due to an injurious environment, which included drug use in the home and a lack of adequate supervision. In the relevant timeframe, Father actually reversed his progress on providing a safe environment for the minors. After his release from incarceration, he lived for some time at his last known address. By January 2025 however, he was apparently no longer residing there, and the only information DCFS/LCFS had about his living situation was that he was living in a hotel but running out of money to stay there.

¶ 70    Next, regarding drug use in the home, we previously discussed why it was imperative for Father to complete his assigned substance abuse services if he was to correct the conditions that gave rise to this case, despite the facts that he was incarcerated when the minors were removed and that Mother was identified as the drug-using parent. This holds true in objectively assessing reasonable progress as well. At no point during the relevant nine-month period could Father show

21

that he was sober. Furthermore, there was no indication that he was on his way to completing substance abuse services, as his failures to submit to drug testing or attend a sobriety support group were both intentional. The only progress he made was in completing a substance abuse assessment, which he only accomplished in the ninth and final month. Therefore, it was not against the manifest weight of the evidence for the circuit court to find his progress on this task to be unreasonable.

¶ 71    Turning to mental health services, Father admits that he only began engaging in counseling in December 2024 which was near the end of the relevant nine-month period. Father did not substantially fulfill this service requirement within this timeframe. Father did show progress on parenting services during this time, and the circuit court recognized as such. However, this was one point in Father's favor that the court weighed against his lack of progress in every other area. Therefore, we conclude that the circuit court's finding of lack of reasonable progress was not against the manifest weight of the evidence.

¶ 72    As for depravity, Father admits that he did not present any evidence at the fitness hearing to rebut the presumption of depravity. He asks this court to review the circuit court's finding of depravity as plain error.

¶ 73    Here, Father does not mention which prong of the plain-error doctrine he believes applies to his argument on appeal, nor does he provide any support for why the circuit court's alleged error falls within either prong. As a reviewing court, we are "entitled to have the issues clearly defined and supported by pertinent authority and cohesive arguments; [we are] not merely a repository into which an appellant may 'dump the burden of argument and research,' nor is it the obligation of this court to act as an advocate or seek error in the record." *U.S. Bank v. Lindsey*, 397 Ill. App. 3d 437, 459 (2009) (quoting *Obert v. Saville*, 253 Ill. App. 3d 677, 682 (1993), and citing Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008)). "An issue not clearly defined and sufficiently presented fails to

22

satisfy the requirements of [Rule 341(h)(7)]." *Cwik v. Giannoulias*, 237 Ill. 2d 409, 423 (2010). Accordingly, we find Father's plain error argument to be forfeited.

¶ 74 Furthermore, having determined that neither of the circuit court's findings of unfitness based on lack of reasonable efforts or reasonable progress were against the manifest weight of the evidence, we repeat that the circuit court's unfitness finding will stand if supported by any one statutory ground. *In re Daphnie E.*, 368 Ill. App. 3d at 1064. Here, the circuit court had already found two.

¶ 75 Therefore, we find that the circuit court's findings at this stage of the termination proceedings were not unreasonable, arbitrary, and were consistent with the evidence presented. The evidence sufficiently supported a finding of unfitness. Thus, the circuit court's determination that Father was an "unfit person" pursuant to the Adoption Act was not against the manifest weight of the evidence.

¶ 76 B. The Circuit Court's Best-Interest Finding

¶ 77 Once the court makes a finding of unfitness, "[t]he issue is no longer whether parental rights *can* be terminated; the issue is whether, in light of the child's needs, parental rights *should* be terminated." (Emphases in original.) *In re D.T.*, 212 Ill. 2d 347, 364 (2004). The parent's interest in maintaining the parent-child relationship "must yield to the child's interest in a stable, loving home life." *Id.* At this stage of the termination hearing, the State bears the burden of proving by a preponderance of the evidence that termination of parental rights is in the child's best interest. *In re J.B.*, 2019 IL App (4th) 190537, ¶ 31.

¶ 78 In making a best-interest determination, the court must consider several factors, within the context of the child's age and developmental needs. 705 ILCS 405/1-3(4.05) (West 2024). The factors are as follows:

"(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural[,] and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child." *In re J.B.*, 2019 IL App (4th) 190537, ¶ 32 (quoting *In re Daphnie E.*, 368 Ill. App. 3d at 1072).

¶ 79    As with the circuit court's findings at the unfitness stage, we afford the court great deference, as it is in a superior position to view the witnesses, assess their credibility, and weigh conflicting evidence. *Id.* ¶ 33. We will not reverse the circuit court's best-interest determination unless it is against the manifest weight of the evidence. *Id.*

¶ 80    On appeal, Father argues that the circuit court's best-interest finding was against the manifest weight of the evidence because the relevant statutory best-interest factors fall in favor of not terminating Father's parental rights. Father makes several assertions in support of this position. The first is that, while he admits the minors would be safe in their current placement, he alleges there was no evidence presented that they would not also be safe with Father. He references Blake's testimony about his completion of parenting classes.

¶ 81    Second, he argues that the factor of the minors' backgrounds and ties falls in his favor because placing the minors with their maternal grandparents would mean cutting them off from Father. He asserts that he would maintain the minors' ties with both sides of their family. He also acknowledges that the minors and their maternal grandparents share Native American heritage.

¶ 82    Next, Father argues that the factor of the uniqueness of every family and child falls in favor of non-termination because the only reason the minors were not placed with him to begin with was that he was incarcerated at the start of the case. He contends that he should have the opportunity to prove that he can be a father to his children.

24

¶ 83    The final factor that Father believes should weigh against termination is the preferences of the persons available to care for the minors. He states that, while the minors' maternal grandparents seemed committed to providing a home for the minors, Father had shown intense dedication to them. He further states that the minors were not placed with their grandparents until May 2025 approximately one year into the case, and that this delay in placement "must mean something."

¶ 84    Father admits that other statutory factors fall either in favor of termination, or he argues that they are neutral. He acknowledges that the development of the minors' identities weighs in favor of termination, as he did not present any evidence to counter Kaitlyn Allen's testimony that the minors had developed their identities with their foster family. Father also recognizes that the factor of the minors' wishes falls in favor of termination, as Allen testified that they desired to stay with their grandparents. Father further admits that the likelihood of the minors' grandparents abandoning them is very low, and thus the factor of the risks attendant to substitute care falls in favor of termination.

¶ 85    Next, Father admits that Allen testified the minors felt attachment, familiarity, and love toward their grandparents, but argues that she also testified they were bonded to Father. He argues that the minors' sense of attachment should be weighed equally on both sides. He also argues that the minors' community ties fall on both sides, because while their grandparents enrolled them in school, they had only just started school in May 2025 and it was not likely that they had enough time to develop "legitimate community ties." Also favoring neither side, according to Father, is the minors' need for permanence. Allen testified that the minors were placed with their other biological siblings and that their maternal grandparents were committed to adoption. However, Father argues that he demonstrated a "clear commitment" to his children through his "dedication to services" and his clear care for the minors.

¶ 86     We begin our review of the circuit court's best-interest determination by reiterating that we defer to the circuit court's determinations of witness credibility and its balancing of competing testimony. While Father did not testify, Linda Blake spoke to his dedication to his children at the fitness hearing, of which the circuit court took judicial notice. Indeed, in delivering its ruling, the circuit court recognized that Father cared for his children. However, Father's desire to continue his parental role in his children's lives is not a relevant factor at this stage. See *In re D.T.*, 212 Ill. 2d at 364. We also restate that we are not tasked with retrying the case, but with determining whether the circuit court's findings were unreasonable, arbitrary, or not based on the evidence presented. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31.

¶ 87     Here, Father admits that 3 of the 10 statutory factors found in section 1-3(4.05) of the Juvenile Court Act (705 ILCS 405/1-3(405) (West 2024)) fall in favor of termination, and further admits that there is at least evidence supporting either outcome on another three factors. We disagree with Father's characterization of the minors' community ties. They had never been in school while in the care of Father and Mother. After they were placed with their grandparents, they both started school and developed improved social skills, which are necessary for forming ties with others. We also disagree with Father's contention that he demonstrated a "dedication to services," for all of the reasons discussed in the previous section.

¶ 88     Regarding the factors Father believes should have been weighed against termination, we note that Father *was* given the opportunity to show that he could be a father for his children. He was given a service plan with specific tasks to complete that would correct the conditions that led to the minors' removal and demonstrate to the court his ability to provide for the minors' health, safety, and overall welfare. Father failed to do so, and therefore it was reasonable for the circuit court to find that it was in the minors' best interests to keep them in their current foster placement.

¶ 89     The circuit court heard Allen's testimony and reviewed the LCFS best-interest report in rendering its decision. The uncontroverted evidence indicated that the minors were both thriving, happy, and well-loved in the home of their maternal grandparents. Allen observed marked growth and improvement in their physical and mental wellbeing, their access to medical care and schooling, their personalities and affect, and their socialization skills. Father does not dispute that the minors have a strong attachment to their maternal grandparents, and the grandparents are able to provide the minors with the love and care they need.

¶ 90     It was also shown at the best-interest hearing that the minors were placed with family and would be raised in their Native culture. They were placed together, and were bonded to one another. They also lived with their maternal siblings, and were surrounded by family. Contrary to Father's insistence that the minors had "only" been placed in their current foster home since May 2025 the minors were shown to have permanency in this placement, as they felt happy and safe living there and their grandparents were willing to adopt them.

¶ 91     The circuit court did not question Father's love for his children. However, in light of the best-interest evidence presented, it found that the State met its burden of proving by a preponderance of the evidence that it was in the minors' best interests to terminate Father's parental rights. We find that the circuit court's determination was not against the manifest weight of the evidence where the balance of the relevant statutory factors aligned with its findings.

¶ 92                                   III. CONCLUSION

¶ 93     For the reasons stated, the circuit court did not err in terminating the respondent's parental rights to the two minors who were the subject of the proceedings herein. The judgment of the circuit court is affirmed.

¶ 94    Affirmed.